David L. **PRICKETT**, Respondent,

v.

**CIRCUIT SCIENCE, INC.**, Respondent,

and

**Commissioner of Jobs and Training, petitioner, Appellant.**

No. CX–92–1985.

Supreme Court of Minnesota.

June 30, 1994.

Tim Theisen, Malzahn & Associates, Ltd., Anoka, for David Prickett.

Tom Harlan, Minneapolis, for Circuit Science, Inc.

## OPINION

WAHL, Justice.

Appellant Commissioner of Jobs and Training asks us to decide whether an employee's failure to report for a new shift assignment because of an inability to obtain child care for the employee's dependent child constitutes misconduct justifying the denial of unemployment compensation. Under the facts of this case, we hold that it does not.

In April of 1991 Respondent David Prickett was employed as a maintenance mechanic with Respondent Circuit Science, Inc. (CSI) in Minneapolis. Prickett worked the first shift, which began at 6:50 a.m. and ended at 3:20 p.m. He was a single father who had agreed, less than one week prior to April 17, 1991, to take temporary custody of his three year old son, Kyle, while the child's mother was in Iowa attending to a family crisis.[1]

At the beginning of Prickett's shift on Friday, April 17, 1991, Prickett's supervisor informed him that he would be required temporarily to work the second shift effective Monday, April 20, 1991. The second shift began at 3:20 p.m. and ended at 11:30 p.m.[2] Prickett stated that he would not be able to report for the second shift on Monday because of babysitting problems.

Over the weekend, Prickett visited with his mother and asked her to take time off from work to care for Kyle. She stated that she could not. Prickett's sister, who was visiting, also was unable to care for Kyle. Prickett called his supervisor, Jeff Kussi, from his

Kent E. Todd, Minnesota Dept. of Jobs and Training, St. Paul, for appellant.

---

1. Prickett had custody of Kyle during the summers and normally would have taken custody of him in May or June.

2. The new shift assignment was made because a coworker on the second shift had transferred to the first shift and as least senior employee Prickett was transferred under the company's agreement with its union. The shift change was to last until a new mechanic was trained on the first shift and transferred to the second shift. Prickett was told this would take approximately two weeks.

mother's house and told Kussi that he was having trouble finding child care.

On Monday, Prickett reported for work at the first shift and told his supervisor that he could not find child care for the second shift. Prickett's supervisor gave him the day off to find child care. Over the next three days, Prickett inquired at five licensed facilities, none of which offered care after 6:30 p.m. Prickett also asked the neighbor who usually watched Kyle during the day if she could care for Kyle in the evening, but because of her own family obligations she was unable to do so.

On April 23, 1991, Prickett met with Supervisor Kussi, CSI Plant Manager Earl Monchamp, CSI Vice President Terry Lutts, and a union representative to discuss the situation. Someone at the meeting suggested that Prickett ask Greg and Lori Voight, friends and coworkers of Prickett's, to watch Kyle. Prickett, however, already had discussed his situation with Lori Voight and had asked her if she would be able to care for Kyle temporarily. Ms. Voight told him that she did not think it would work out. Although this conversation took place prior to April 23, Prickett did not mention it at the meeting. Prior to the meeting, Lutts had spoken with Greg Voight who stated that he was "more willing to do this as it was a temporary situation." Lutts did not approach Ms. Voight on the matter. After the meeting, Prickett spoke with Greg Voight. Greg Voight told Prickett he felt the arrangement would be quite difficult because Prickett would have to bring Kyle to CSI where he would wait for two hours until the Voights got off their shift, and then Prickett would have to pick Kyle up from the Voights' home at approximately 1:00 a.m. Mr. Voight, however, said that the decision was "basically up to Lori."

On April 24, 27, and 28, Prickett was suspended from work for his unexcused absences. On April 29, Prickett again called to explain that he would not report for work during the second shift because he did not have child care. CSI then terminated Prickett's employment.

Prickett filed for unemployment compensation benefits on May 3, 1991. On May 19, 1991, a Department of Jobs and Training Claims Representative denied Prickett's claim on the ground that Prickett had voluntarily quit his employment without good cause attributable to the employer. On appeal, a Referee, after an evidentiary hearing, found that Prickett was disqualified from receiving unemployment compensation benefits because he had been discharged for misconduct due to his absences. The Referee also found that CSI had arranged temporary child care with the Voights, but that Prickett had declined to use it. The Representative of the Commissioner affirmed the Referee's decision. The court of appeals reversed, holding that the rule set out in *Swanson v. Minneapolis–Honeywell Regulator Co.*, 240 Minn. 449, 61 N.W.2d 526 (1953) and *Thompson v. Schraiber*, 253 Minn. 46, 90 N.W.2d 915 (1958), that inability to obtain child care for certain shifts rendered the claimants "unavailable for work" and justified denial of benefits, had been "substantially eroded by time" and was "ill suited to modern childcare realities." *Prickett v. Circuit Science, Inc.*, 499 N.W.2d 506, 509 (Minn.App.1993). We granted review.

The unemployment compensation statute is remedial in nature and must be liberally construed to effectuate the public policy set out in Minn.Stat. § 268.03 (1992). *Smith v. Employers' Overload*, 314 N.W.2d 220, 221 (Minn.1981). Since § 268.03 includes the statement that "unemployment reserves [are] to be used for the benefit of persons unemployed through no fault of their own," the disqualification provisions of the unemployment compensation statute must be narrowly construed. *Smith*, 314 N.W.2d at 222.

The standard for determining whether a claimant is disqualified because of termination for misconduct is stated in Minn.Stat. § 268.09 subd. 1(b) (1992):

Subdivision 1. **Disqualifying conditions.** An individual separated from any employment under paragraph * * * (b) * * * shall be disqualified for waiting week credit and benefits * * * *

(b) **Discharge for misconduct.** The individual was discharged for misconduct,

not amounting to gross misconduct connected with work or for misconduct which interferes with and adversely affects employment.

We adopted a widely accepted definition of the term "misconduct" in *In re Claim of Tilseth,* 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973):

> The intended meaning of the term 'misconduct' * * * is limited to conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct.'

Absenteeism qualifies as misconduct. *Moeller v. Minnesota Dep't of Transp.,* 281 N.W.2d 879, 882 (Minn.1979).

Prickett's conduct in this case is not conduct evincing willful or wanton disregard of an employer's interests and it does not indicate that Prickett had a lack of concern for his job. *See, e.g. Abramson v. Yellow Taxi Co. of Minneapolis,* 308 Minn. 453, 242 N.W.2d 77 (1976). Rather, Prickett's conduct is more a "failure in good performance as the result of inability." *Tilseth,* 295 Minn. at 375, 204 N.W.2d at 646.

■ The change in Prickett's shift was substantial and he was given only three days, over a weekend, during which to find night-time child care. *See Newland v. Job Service North Dakota,* 460 N.W.2d 118, 123–24 (N.D. 1990) (holding that a shift change could constitute good cause attributable to the employer where the change in hours was "substantial"); *see also Beard v. State Dep't of Commerce, Div. of Employment Sec.,* 369 So.2d 382, 384 n. 1 (Fla.App.1979) (holding claimant voluntarily quit without good cause but noting "[h]ad she spent the weekend in an unsuccessful effort to make suitable arrangements for her children and *then* had her request [for a leave of absence during which she would arrange child care] denied, a different question might be presented.") Prickett demonstrated that he had made good faith efforts to obtain adequate child care and that it was unavailable to him.[3] He maintained contact with his employer and reported, daily, that he had been unable to obtain child care.

Given the facts of this case, where the employee is given three days' notice of a shift change, where the shift change is substantial, and where the employee presents sufficient evidence of good faith efforts to obtain child care, we hold that the employee's failure to report to a new shift assignment because of an inability to obtain adequate care for the employee's dependent child does not constitute misconduct justifying denial of unemployment compensation benefits. To hold otherwise would be to ignore significant facts about the world today. In 1990, almost 60% of children in Minnesota lived in families in which both parents worked outside the home. Population Reference Bureau for the Center for the Study of Social Policy, *The Challenge of Change: What the 1990 Census Tells Us About Children* 43 (1992). Another 9.3% lived in families with one working parent. *Id.* If Prickett had left his child without supervision, he would have been subject to criminal sanctions. Minn.Stat. § 609.378

---

**3.** The Referee's finding that CSI had arranged child care for Prickett is not supported by the record. The record shows only that Mr. Voight stated that he would be "more willing" to care for Kyle because the situation was temporary. Mr. Voight also stated that the final decision was up to Ms. Voight, who had stated earlier to Prickett that "it would not work out." It is also apparent from the record that this arrangement would have been considerably inconvenient for the Voights, as well as Prickett. Finally, it would almost certainly have required some sort of special arrangement to keep a three year-old child at CSI for two hours a day. The record fails to show that CSI would have offered any accommodation to Prickett so that Kyle could be adequately supervised while his father worked.

(1992). He also could have been sanctioned for failure to support Kyle.[4] Minn.Stat. § 609.375 (1992). Under these limited circumstances, Prickett seemed to have no choice but to do as he did and we cannot hold that he engaged in "wilful misconduct." To the extent *Swanson v. Minneapolis–Honeywell Regulator Co.*, 240 Minn. 449, 61 N.W.2d 526 (1953) and *Thompson v. Schraiber*, 253 Minn. 46, 48, 90 N.W.2d 915, 916 (1958) require a contrary result, they are overruled.

We affirm the decision of the court of appeals.

**4.** We note, too, that other state benefits might not have been available to Prickett upon becoming unemployed. For example, under Minn.Stat. § 256.871(2)(c) (1992), emergency assistance to needy children will be denied where the child's need arose because their parent "refused without good cause to accept employment."