Cassandra J. JENKINS, Relator,

v.

AMERICAN EXPRESS FINANCIAL CORPORATION, Respondent,

Department of Employment and Economic Development, Respondent.

No. A04–2308.

Court of Appeals of Minnesota.

Sept. 6, 2005.

Katherine L. MacKinnon, St. Louis Park, MN, for relator.

American Express Financial Corporation, c/o TALX UCM Services, Inc., St. Louis, MO, for respondent.

Linda A. Holmes, Department of Employment and Economic Development, St. Paul, MN, for respondent commissioner.

Considered and decided by PETERSON, Presiding Judge; HALBROOKS, Judge; and STONEBURNER, Judge.

## OPINION

HALBROOKS, Judge.

Relator challenges the decision by the senior-unemployment-review judge (SURJ), affirming a decision by the unemployment-law judge (ULJ), that she was disqualified from receiving unemployment benefits because she was discharged for misconduct. Although relator was eligible for work release under Minn.Stat. § 631.425 (2002) while she was incarcerated, the ULJ found that her employer was not obligated to call and verify her employment in order to allow her continued attendance at work. Relator argues that the employer's failure to call and verify her employment under Minn.Stat. § 631.425 does not constitute fault attributable to the employee, and, therefore, her absence from work under these circumstances should not constitute misconduct. We affirm.

## FACTS

Relator Cassandra Jenkins was employed as an insurance specialist by respondent American Express Financial Corporation (employer). In January 2004, she was convicted of assaulting a nurse while being treated for a broken ankle and was sentenced to 30 days in jail. The district court in the criminal matter was aware that relator was employed and, consequently, committed her to work release pursuant to Minn.Stat. § 631.425 (2002), also known as a "Huber law" work release. Relator was ordered to begin her sentence on April 18, 2004.

Relator states that she met with her supervisor, Joel Hansen, twice prior to April 18 and explained her situation. She further states that Hansen told her that "American Express had had other employees do work release and [that] he would be willing to accommodate [relator] and verify her employment for work release purposes." Both relator and respondent agree that, at the time relator reported to the workhouse, she understood that her employer was going to cooperate in her work release.

Relator presented herself to corrections officials on April 18 and unsuccessfully attempted to contact Hansen the next day, so that he could verify her employment. She testified that she called Hansen every day that week, left multiple messages asking him to call the work-release program to verify her employment, and had both a friend and relator's social worker, David Huberty, call Hansen on relator's behalf. According to relator, she reached Hansen on one occasion, but was told that he would get back to her. Huberty stated that he left Hansen a voicemail "clearly outlining that all [Hansen] had to do was make one phone call to the [w]orkhouse to facilitate [relator's] 'work release[.']" [Huberty] even left the name of the contact person at the [w]orkhouse and that person's direct phone number."

On April 22, 2004, Hansen sent relator a letter advising that she had been absent from work since April 19 and informing her that if she did not return to work on April 26, the employer would assume that she had voluntarily resigned. The letter did not mention relator's work release. When relator failed to report for work on April 26, she was discharged.

Relator subsequently applied for unemployment benefits, and an account was opened on August 15, 2004. An adjudicator for the Minnesota Department of Employment and Economic Development (department) found that relator was disqualified from receiving benefits because she was discharged for misconduct. Relator appealed, and a telephone hearing was held before a ULJ on October 20. The employer did not appear at the hearing or present any evidence.

The ULJ found that relator was "unavailable for work due to her incarceration" and that "[a]lthough [relator] was eligible for work release under the Huber law, her employer was not obligated to call and verify her employment in order to allow her to continue[ ] attendance at work." The ULJ further found that it was relator's conduct that led to her incarceration and that this conduct "was intentional and displayed clearly a substantial lack of concern for her employment." Consequently, the ULJ concluded that relator was disqualified from receiving unemployment benefits. Relator then appealed to

the SURJ,[1] who issued an order pursuant to Minn.Stat. § 268.105, subd. 2a(a) (2004),[2] declining to conduct further proceedings and adopting the findings of fact and decision of the ULJ as final. This certiorari appeal follows.

## ISSUE

Did the SURJ err by holding that relator was disqualified from receiving unemployment benefits based on misconduct when relator's employer failed to call to verify her employment for purposes of work release under Minn.Stat. § 631.425 (2002)?

## ANALYSIS

On appeal, we review the decision of the SURJ rather than that of the ULJ.[3] *Weaver v. Minn. Valley Labs., Inc.*, 470 N.W.2d 131, 133 (Minn.App.1991). The standard of review in unemployment-benefit cases is narrow. *McGowan v. Executive Express Transp. Enters.*, 420 N.W.2d 592, 594 (Minn.1988). The factual findings of the SURJ are "viewed in the light most favorable to the decision, and if there is evidence reasonably tending to sustain them, they will not be disturbed." *White v. Metro. Med. Ctr.*, 332 N.W.2d 25, 26 (Minn.1983). On questions of law, we are not bound by the SURJ's conclusions, but exercise our own independent judgment. *Markel v. City of Circle Pines*, 479 N.W.2d 382, 384 (Minn.1992). Whether an

1. Effective August 1, 2004, the statutory title of the individual conducting review proceedings under Minn.Stat. § 268.105, subd. 2 (2004), was changed to "senior unemployment review judge." *Compare* Minn.Stat. § 268.105, subd. 2 (2004), *with* Minn.Stat. § 268.105, subd. 2 (2002) (referring to the representative of the commissioner).

2. Minnesota law permits the SURJ to adopt the findings of fact and decision by the ULJ as the final findings of fact and decision of the

Department of Employment and Economic Development. Minn.Stat. § 268.105, subd. 2a(a) (2004). This new procedure "applies to all decisions issued by the department on or after [August 1, 2004]." 2004 Minn. Laws ch. 183, § 71.

3. Of course, when, as here, the SURJ adopts the decision of the ULJ pursuant to Minn. Stat. § 268.105, subd. 2a(a), those decisions are identical.

employee committed a specific act is a question of fact. *Scheunemann v. Radisson S. Hotel,* 562 N.W.2d 32, 34 (Minn. App.1997). But whether specific acts constitute misconduct is a question of law, which we review de novo. *Id.* at 34.

When employees are discharged for employment misconduct, they are disqualified from receiving unemployment benefits.[4] Minn.Stat. § 268.095, subd. 4 (Supp.2003). Under Minnesota law, employment misconduct is "any intentional, negligent, or indifferent conduct, on or off the job (1) that evinces a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee, or (2) that demonstrates a substantial lack of concern for the employment." *Id.,* subd. 6(a) (Supp.2003). On appeal in unemployment cases, we do not determine whether the employee should have been terminated, but whether the employee should receive unemployment benefits. *Ress v. Abbott NW Hosp., Inc.,* 448 N.W.2d 519, 523 (Minn.1989); *see also Windsperger v. Broadway Liquor Outlet,* 346 N.W.2d 142, 143 (Minn.1984) (explaining that the issue in economic-security cases "is not whether [relator] should have been terminated, but whether, now that she is unemployed, she should be denied unemployment compensation benefits as well").

Relator first argues that the ULJ[5] erred by concluding that incarceration bars receipt of benefits as a matter of law and notes that the supreme court in *Grushus v. Minn. Mining & Mfg. Co.,* 257 Minn. 171, 100 N.W.2d 516 (1960), did not establish a per se rule of disqualification whenever an employee is incarcerated. Indeed, the *Grushus* court stated that the department bears the responsibility of making a fact determination in each case regarding whether an employee's conduct, including conduct leading to incarceration, caused his or her inability to work.[6] *Id.* at 176, 100 N.W.2d at 520.

Contrary to relator's argument, there is no indication that the ULJ concluded "as a matter of law" that incarceration disqualifies an employee from receiving benefits. Instead, the department did what the *Grushus* court indicated that it should do—it made a fact determination regarding misconduct. *Id.* At the hearing, relator testified regarding the circumstances surrounding her incarceration and sentencing under Minn.Stat. § 631.425 (2002), as well as promises allegedly made to her by Hansen. The findings of the ULJ also outline the relevant facts, including relator's conviction and incarceration, her claim concerning the employer's duty to call to verify her employment and the fact that the employer did not do so, and her subse-

---

4. The revisor's office inadvertently substituted the term "ineligible for" for the term "disqualified from" in Minn.Stat. § 268.095, subds. 1, 4, 7, 8(a) (Supp.2003). *See* Minn. Stat. § 268.095, subds. 1, 4, 7, 8(a) (2002) (using term "disqualified from"); 2003 Minn. Laws 1st Spec. Sess. ch. 3, art. 2, § 11 (making other changes to Minn.Stat. § 268.095, subd. 1, but retaining term "disqualified from"); 2003 Minn. Laws 1st Spec. Sess. ch. 3, art. 2, § 20(j), (k) (directing revisor to change the term "disqualified from" to "ineligible for" only in Minn.Stat. § 268.095, subd. 12, and then to renumber the subsection to Minn.Stat. § 268.085, subd. 13b).

5. Because the SURJ adopted the findings and determination of the ULJ, we review ULJ's decision.

6. As the supreme court recognized, there may be situations in which unemployment does not result from the employee's "fault," such as when "an employee is illegally detained by prosecuting authorities or [when] ... he may be released without prosecution or his innocence [is] finally determined." *Grushus,* 257 Minn. at 176, 100 N.W.2d at 520.

quent discharge for absenteeism. Because there is evidence in the record to reasonably support these findings, we will not disturb them. *White,* 332 N.W.2d at 26.

▮▮▮ Whether relator's absence from work due to her incarceration constitutes employment misconduct is a question of law. *See Scheunemann,* 562 N.W.2d at 34 (stating that whether specific acts constitute misconduct is a question of law). In cases such as this, "[t]he critical factor is whether the employee's behavior caused [her] failure to report to work." *Winkler v. Park Refuse Serv., Inc.,* 361 N.W.2d 120, 124 (Minn.App.1985). In general, absences resulting from "circumstances within the control of the employee" are misconduct. *Id.* We have previously held that "[a]bsence from work due to incarceration for criminal acts is misconduct sufficient to disqualify an employee from receiving unemployment compensation benefits." *Smith v. Am. Indian Chem. Dependency Diversion Project,* 343 N.W.2d 43, 46 (Minn.App.1984). It is not the incarceration per se that constitutes the misconduct; rather, the misconduct is the absence from work resulting from criminal activities. *Id.; cf. Grushus,* 257 Minn. at 176, 100 N.W.2d at 520 (noting that it was relator's illegal act resulting in arrest and incarceration that was the cause of his failure to accept suitable work when it was offered to him).

Relator contends that her inability to get to work was not her fault and argues that *Smith* is inapposite because she was "[f]or all purposes ... able to work and her confinement in the workhouse posed *no obstacle* to her employment." (Emphasis added.) We disagree. Relator's confinement did pose an obstacle to her employment. It is true that, had her employer called to verify her employment, relator would have presumably participated in the work-release program and been present for work as required. But it is also true that her employer did not call and that relator remained incarcerated and unable to attend work. As in *Smith,* relator did not intend to disqualify herself from receiving benefits. Nonetheless, her conduct led to her incarceration, which, in turn, caused her absence. It was this conduct that the ULJ determined to be intentional and which "displayed clearly a substantial lack of concern for [relator's] employment."

Relator implies that affirming the SURJ's decision would fail to "effectuate the public policy" underlying unemployment benefits. The stated public purpose of the unemployment-insurance program is to provide benefits for "workers who are unemployed through *no fault* of their own." Minn.Stat. § 268.03, subd. 1 (2004) (emphasis added). Here, it cannot be said that relator bears "no fault" for her unemployment. Although the inaction of her employer may have played a role, the fact remains that relator engaged in the behavior that led to her incarceration. Because relator's own actions ultimately caused her failure to report for work, her absence was misconduct sufficient to disqualify her from receiving unemployment benefits. *Winkler,* 361 N.W.2d at 124; *Smith,* 343 N.W.2d at 46.

Finally, in her reply brief, relator challenges the ULJ's conclusion that the "employer was not obligated to call and verify [relator's] employment," arguing that the employer's promise to verify her employment created a duty that was then breached by the employer's failure to follow through on that promise. Relator's argument fails.

Citing several decisions from this court, relator suggests that an employee is entitled to unemployment benefits whenever an employee quits due to an employer's failure to honor a promise to that employ-

ee. But the authority cited by relator is inapposite. In each of these cases, we found good cause for an employee to resign when the employer breached a promise contained in an employment agreement and "concerning the terms or conditions of employment." *Hayes v. K–Mart Corp.*, 665 N.W.2d 550, 553–54 (Minn.App.2003) (citing *Krantz v. Loxtercamp Transp., Inc.*, 410 N.W.2d 24, 27 (Minn.App.1987); *Baker v. Fanny Farmer Candy Shops No. 154*, 394 N.W.2d 564, 566 (Minn.App. 1986)), *review denied* (Minn. Sept. 24, 2003). Moreover, in none of these cases is there any indication of misconduct on the part of the employee.

Here, the alleged promise had nothing to do with the "terms or conditions" of relator's employment. More importantly, the circumstances necessitating the promise resulted from relator's own actions and, as discussed above, ultimately caused her failure to report to work. Although we cannot condone the actions of the employer, it was under no duty to call and verify relator's employment. As the Colorado Court of Appeals stated under similar circumstances,

> [w]e are unaware of any requirement that an employer participate in a work release program in order to allow employees to continue to work during periods of incarceration. Absent such a requirement, we perceive no basis to impute fault upon the employer for an employee's separation from work caused by his incarceration.

*Smith v. Indus. Claim Appeals Office of the State of Colorado*, 817 P.2d 635, 636 (Colo.Ct.App.1991). Accordingly, the SURJ did not err by concluding that relator's actions constituted misconduct disqualifying her from receiving unemployment compensation.

## DECISION

Because relator's actions led to her incarceration, which, in turn caused her failure to report to work, her absence was misconduct sufficient to disqualify her from receiving unemployment benefits. Contrary to relator's argument, her employer was under no duty to call to verify her employment for purposes of work release under Minn.Stat. § 631.425 (2002).

**Affirmed.**

STONEBURNER, Judge (dissenting).

I respectfully dissent from the majority's conclusion that failure of an employer to verify employment, which prevented relator from exercising work-release privileges granted by a district court, constitutes employee misconduct.

A defendant who is sentenced to a term in a county jail, workhouse or "lockup" may be permitted work-release privileges, within the judge's discretion. Minn.Stat. § 631.425, subd. 2 (2002). If a defendant granted work release has been regularly employed, "the sheriff shall arrange for a continuation of the employment insofar as possible without interruption." Minn.Stat. § 631.425, subd. 3 (2002). "[T]he purpose of work release is to allow continued or new employment, which can benefit not only (or even primarily) a defendant but the inmate's family, a victim owed restitution, a court, and society generally...." 9 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice* § 36.13 (3d ed.2001).

The ULJ held that relator's employer was not obligated to call and verify relator's employment. But the record does not support the assertion that the employer was required to place a call, only that the employer, who was called, had to verify employment. Although the record is not well developed because the employer did not take part in the hearing, it appears that the employer was only asked to place

a call because the employer failed to answer calls made on relator's behalf.

Respondent argues that an employer has no duty "to participate in work release" and that because relator is responsible for the act that resulted in her being sentenced, and her sentence resulted in her being unavailable for work, she has committed misconduct and is disqualified from receiving unemployment benefits. But the work-release statute does not involve any "participation" by an employer in work release. A defendant is either employed or not employed when granted work release. An employer is not required to do anything other than verify employment. The judge in this case allowed work release, apparently because relator was employed when she was sentenced. The sheriff was mandated to arrange for continuation of her employment insofar as possible without interruption. I would hold that the employer's thwarting of work release by failing to verify employment, thereby making the employee unable to attend work, should not result in a determination that the employee engaged in misconduct.

An at-will employer may certainly terminate an employee's employment for being convicted of a crime, and such a termination may result in a determination that the employee was terminated for misconduct. But relator's employment was not terminated for her conviction. She was terminated because the employer made it impossible for her to take advantage of an important correctional tool provided by the legislature and imposed by the judge in this case.