Cassandra J. JENKINS, Appellant,

v.

AMERICAN EXPRESS FINANCIAL CORP., Respondent,

Minnesota Department of Employment and Economic Development, Respondent.

No. A04–2308.

Supreme Court of Minnesota.

Sept. 14, 2006.

Katherine L. MacKinnon, St. Louis Park, MN, for appellant.

Lee B. Nelson, Linda A. Holmes, MN Dept. of Employment and Economic Development, St. Paul, MN, for respondent Department of Employment and Economic Development.

Charles H. Thomas, Mankato, MN, for amicus curiae Southern Minnesota Regional Legal Services, Inc.

## OPINION

MEYER, Justice.

Appellant Cassandra Jenkins seeks reversal of the court of appeals' decision affirming her disqualification from the receipt of unemployment compensation on grounds of a discharge for misconduct. At issue is whether absenteeism due to incarceration is misconduct when the employer fails to verify employment for purposes of a work-release program. Under the unique facts of this case, we conclude that the employee's absence from work was not misconduct, and we reverse the court of appeals.

Jenkins began working for respondent American Express Financial Corporation (employer) as an insurance specialist on November 27, 2000. In January 2004 she was convicted of assaulting a nurse while being treated for a broken ankle. She was then sentenced to 30 days in jail with work-release privileges under the Huber law, Minn.Stat. § 631.425 (2004). Jenkins was scheduled to begin her sentence on April 18, 2004.

Before she began serving her sentence, Jenkins was told by her employer that the employer was going to cooperate with her work-release privileges and provide verification of her employment to the workhouse. She twice discussed her conviction and sentence with Joel Hansen, her supervisor. According to Jenkins, Hansen indicated that employees had participated in work release in the past and that Jenkins would be able to maintain her employment while on work release.

Jenkins reported to the workhouse on Sunday, April 18, 2004, at which time she discovered that Hansen had not verified her employment, so she was not able to report for work the next day. Jenkins made repeated attempts over the next several days to contact Hansen and secure his cooperation. She was only able to speak to him on one occasion at which time he was noncommittal and indicated he "would get back to her." A friend of Jenkins' and Jenkins' social worker, David Huberty, also attempted to reach Hansen.[1] Huberty left Hansen a voicemail message "clearly outlining that all he had to do was to make one phone call to the [w]orkhouse to facilitate Ms. Jenkins' [ ]work release[ ]. [Huberty] even left him the name of the contact person at the [w]orkhouse and that person's direct phone number." The employer did not appear at the administrative hearing on Jenkins' case so the employee's version of these events is undisputed.

On April 22, 2004, the employer sent a letter to Jenkins advising her that if she did not return to work on Monday, April 26, the employer would assume Jenkins voluntarily resigned. Still lacking verification of her employment, Jenkins was unable to report for work on April 26, and her employment was terminated.

Jenkins filed an application for unemployment benefits and established a benefit account with the Department of Employment and Economic Development. The department adjudicator determined that Jenkins had been discharged by her employer for misconduct and therefore

---

1. Huberty did not participate in the administrative hearing on Jenkins' case, but Jenkins introduced the letter he had written describing his involvement in Jenkins' efforts to secure work release. Reflecting the expedited nature of unemployment benefit proceedings, the applicable rules anticipate the need to consider all of the circumstances of an employee's departure in reaching unemployment benefits qualification determinations, and specifically allow hearsay evidence in keeping with that goal. Minn. R. 3310.2922 (2005).

was disqualified from the receipt of unemployment benefits. Jenkins appealed. Following an evidentiary hearing, the unemployment law judge (ULJ) found that Jenkins was discharged for employment misconduct because she was unavailable for work due to her incarceration. On further appeal, a senior unemployment review judge declined to conduct further proceedings and adopted the decision of the ULJ as the final agency decision pursuant to Minn.Stat. § 268.105, subd. 2a (2004).

The court of appeals affirmed the department's denial of benefits. *Jenkins v. Am. Express Fin. Corp.*, 702 N.W.2d 908, 914 (Minn.App.2005). The court determined that the evidence in the record reasonably supported the ULJ's finding that Jenkins had been discharged for absenteeism. *Id.* at 912–13. The court acknowledged that Hansen's inaction "may have played a role" in creating Jenkins' unemployment but found that Jenkins was not among those the unemployment insurance program was designed to assist: "workers who are unemployed through *no fault* of their own." *Id.* at 913 (quoting Minn.Stat. § 268.03, subd. 1 (2004)). "[T]he fact remains that [Jenkins] engaged in the behavior that led to her incarceration." *Jenkins*, 702 N.W.2d at 913. The court also found that while it could not "condone the actions of the employer," Hansen's undisputed promise to allow Jenkins to continue her employment while on work release created "no duty to call and verify [Jenkins'] employment." *Id.* at 914.

▇▇▇ Under the standard of review applicable to employment benefit cases, we examine a senior unemployment review judge's factual findings in the light most favorable to the decision, and we will not disturb those findings as long as there is evidence that reasonably tends to sustain them. *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn.2002); *Markel v. City of Circle Pines*, 479 N.W.2d 382, 383–84 (Minn.1992).[2] Whether an employee has engaged in conduct that disqualifies him from unemployment benefits is a mixed question of fact and law. *Schmidgall*, 644 N.W.2d at 804. Specifically, the determination of whether an employee was properly disqualified from receipt of unemployment compensation benefits is a question of law on which we are free to exercise our independent judgment. *Ress v. Abbott Northwestern Hosp., Inc.*, 448 N.W.2d 519, 523 (Minn.1989).

We have noted that "[t]he unemployment compensation statute is remedial in nature and must be liberally construed to effectuate the public policy set out in Minn.Stat. § 268.03," which states that the unemployment benefits provisions are " 'to be used for the benefit of persons unemployed through no fault of their own.' " *Prickett v. Circuit Science, Inc.*, 518 N.W.2d 602, 604 (Minn.1994) (citing Minn. Stat. § 268.03 (1992)). We have stated that this policy urges us to narrowly construe the disqualification provisions. *Id.*

An otherwise eligible employee will be disqualified from the receipt of unemployment benefits for a variety of reasons, including a discharge for employment misconduct or a discharge for aggravated employment misconduct. Minn.Stat. § 268.095, subd. 4 (Supp.2003).[3] Employ-

2. *Markel* and *Schmidgall* both refer to the determination made by "the commissioner." 479 N.W.2d at 383; 644 N.W.2d at 803. At the time of the department's review of Jenkins' case, the statutory title of the person conducting the review of proceedings under Minn.Stat. § 268.105, subd. 2(a) (2004) was "senior unemployment review judge."

3. Because Jenkins was discharged in April 2004, the 2003 version of the statute applies. In executing changes made by the 2003 legis-

ment misconduct is defined as "any intentional, negligent, or indifferent conduct, on the job or off the job (1) that evinces a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee, or (2) that demonstrates a substantial lack of concern for the employment." Minn. Stat § 268.095, subd. 6(a) (Supp.2003). But "[i]nefficiency, inadvertence, simple unsatisfactory conduct, * * * [or] conduct an average reasonable employee would have engaged in under the circumstances * * * [is] not employment misconduct." *Id.* The misconduct definitions set out in the act are exclusive "and no other definition shall apply." Minn.Stat. § 268.095, subd. 6(e) (2004).

■ Absence from work under circumstances within the control of the employee, including incarceration following a conviction for a crime, has been determined to be misconduct sufficient to deny benefits. *Smith v. Am. Indian Chem. Dependency Diversion Project,* 343 N.W.2d 43, 46 (Minn.App.1984); *cf. Grushus v. Minnesota Mining & Mfg. Co.,* 257 Minn. 171, 176, 100 N.W.2d 516, 520 (1960). In *Grushus v. Minnesota Mining & Manufacturing Co.,* we found that an employee's incarceration *did* constitute misconduct such that he should be denied unemployment benefits. *Id.* Grushus was unable to accept an offer of employment following a lay-off because he was incarcerated on burglary and larceny charges. *Id.* at 172, 100 N.W.2d at 517–18. The agency then administering the state's unemployment benefits program determined that his incarceration did not disqualify him for benefits from the time he was released from custody. *Id.,* 100 N.W.2d at 518. We reversed because we found that Grushus's failure to accept the offer of employment was due to his own fault. *Id.* at 176, 100 N.W.2d at 520. Importantly, though, we declined to adopt a rule that absenteeism resulting from incarceration was misconduct as a matter of law. Instead, we directed the agency to base its determinations "upon the facts in each particular case, [leaving] the commissioner * * * with the responsibility of finding the facts as to 'good cause' and 'fault' within the intent and purpose of the act." *Id.*

■ We turn to the facts of this case to determine whether the employee engaged in misconduct. The first statutory definition of misconduct is conduct "that evinces a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee." Minn. Stat. § 268.095, subd. 6(a)(1). This definition is an objective determination: was the employer's expectation for the employee reasonable under the circumstances? The court of appeals applied this definition and determined that because the absenteeism resulted from Jenkins' criminal conviction it was misconduct because American Express was not obligated to verify Jenkins' employment. *Jenkins,* 702 N.W.2d at 914. The employer in this case does not argue that Jenkins' off-the-job behavior violated its standard of behavior for its employees. Rather, the employer contends that it was

lature to section 268.095, the revisor's office mistakenly changed the term "disqualified from" to "ineligible for" in subdivisions 1, 4, 7, and 8(a). *See* Act of May 30, 2003, 1st Spec. Sess., ch. 3, art. 2, § 20(j), (k), 2003 Minn. Laws 1460, 1477 (directing revisor to change "disqualified from" to "ineligible for" only in Minn.Stat. § 268.095, subd. 12, and to recodify the subdivision to Minn.Stat.

§ 268.085, subd. 13b); Minn. Stat § 268.095, subds. 1, 4, 7, 8(a) (2004) ("disqualified from" restored). Since the ULJ incorrectly referenced and seemingly relied on the 2004 version of the statute (wherein the error was rectified), there is no indication that the revisor's error affected the outcome of Jenkins' case.

the simple fact of Jenkins' failure to report to work that violated the employer's reasonable expectation.

But the facts here lead us to conclude that it was unreasonable for the employer to expect Jenkins to report to work by April 26: the employer allowed Jenkins to continue working between the time of her conviction in March and the time she reported to the workhouse in April; the employer knew in advance of April 18 that Jenkins would be able to participate in a work-release program if the employer verified her employment; the employer told Jenkins that employees in the past had been allowed to participate in work-release programs; the employer told Jenkins that she would be able to continue working while she served her sentence; Jenkins and others provided the employer with the name and phone number of the person to contact to verify Jenkins' employment; and the employer failed to verify Jenkins' employment despite good faith efforts on the part of Jenkins and others to obtain the verification.

Jenkins' case is distinguishable from cases in which absenteeism due to incarceration was found to be misconduct: *Grushus; Smith v. American Indian Chemical Dependency Diversion Project;* and the Colorado case the court of appeals relied on specifically, *Smith v. Industrial Claim Appeals Office of the State of Colorado,* 817 P.2d 635, 636 (Colo.Ct.App.1991). In all three of those cases, the claimant simply failed to show up at work because he had been incarcerated. *See Grushus,* 257 Minn. at 172, 100 N.W.2d at 517–18 (failing to respond to a recall notice because he was in jail); *Smith v. Am. Indian Chem. Dependency Diversion Project,* 343 N.W.2d at 44 (missing three days of work because of incarceration); *Smith v. Indus. Claim Appeals Office of the State of Colorado,* 817 P.2d at 636 (failing to report to work because he was in jail). In both of the *Smith* cases, the claimant did not contact his employer until *after* he had missed work because he had been incarcerated. 343 N.W.2d at 44. The *Grushus* case also involved deception to the employer as to the reasons for the claimant's inability to return to work. 257 Minn. at 172, 100 N.W.2d at 517–18.

For the above reasons, we conclude that the first statutory definition of misconduct relied on by the court of appeals is not satisfied.

■ The second statutory definition of misconduct is whether the employee "demonstrate[d] a substantial lack of concern for [her] employment." Minn.Stat. § 268.095, subd. 6(a)(2). The ULJ in this case determined that "Jenkins was discharged for employment misconduct as it was her conduct which caused her incarceration. Her conduct was intentional and displayed clearly a substantial lack of concern for her employment." Essentially, the judge concluded that the assault Jenkins committed represented misconduct from which Jenkins could not redeem herself in that Jenkins' criminal act that resulted in jail time was misconduct as a matter of law for unemployment benefit purposes. This type of conclusion is not permitted by our case law. Under *Grushus* the inquiry must focus on the facts in this particular case as to whether Jenkins' misconduct was established by evidence that demonstrates a substantial lack of concern for her employment. 257 Minn. at 176, 100 N.W.2d at 520.

Committing a crime that results in a period of incarceration may be evidence that an employee lacked concern for her employment. In this case, however, there is substantial evidence that Jenkins' inability to report to work was not caused by a substantial lack of concern for her employment. The record establishes that Jenkins

made diligent efforts to report to work. She informed her employer of her conviction and the availability of work release to allow her to continue her employment; she obtained a verbal assurance from the employer that the employer would cooperate with the work-release program; as soon as she became aware that she would not be able to report to work because her employment had not been verified, she made every effort to contact the employer; and she provided her employer with the necessary information to permit her release from the workhouse. The evidence as a whole amply demonstrates that she engaged in significant attempts to report for work and continue her employment. Her conduct does not demonstrate a substantial lack of concern for her employment. As noted above, this case is distinguishable from the *Grushus* and *Smith* cases relied on by the court of appeals because Jenkins established that she could have come to work despite her incarceration.

We do not hold that an employer that refuses to participate in the Huber program will always be estopped from claiming employee misconduct in a subsequent claim for unemployment compensation benefits. Under our holding, an employer remains free to contest an unemployment compensation claim on the basis of employee misconduct if the underlying conviction or the absence from work demonstrates a substantial lack of concern for the employment under Minn.Stat. § 268.095, subd. 6(a)(2) or, alternatively, there was aggravated misconduct under Minn.Stat. § 268.095, subd. 6a (2004).

The department's argument that under anything but a very narrow rule accounting for the employer's reasonable expectations an employer will be responsible to take any of a variety of actions to ensure an employee's ability to work (furnishing a bus pass, securing housing, or child care,

etc.) is unavailing. It is reasonable for an employer to expect an employee to make the arrangements within his or her power to facilitate his or her employment. In *Prickett* we decided—after a careful review of the facts and prior to the integration of the employer's reasonable expectations into the misconduct definition—that it was not misconduct for an employee to miss work where he only had three days to arrange for child care in response to a shift change. 518 N.W.2d at 605. The *Prickett* decision did not establish a rule that an employer must provide child care to facilitate an employee's attendance. Likewise, our decision here does not preclude employers from claiming misconduct because an employee was in jail and unable to continue working while on work release. Whether those circumstances justify a finding of misconduct, per *Grushus*, will be judged on those facts.

The department also suggests that the employer might, by failing to perform some ministerial duty, sacrifice the "right" to expect an employee to observe some certain standard of behavior. But we emphasize, again, that we are not establishing a rule that employers must allow an employee to continue in her or his employment while on work release. Indeed, the duty to ensure that work-release sentences are executed remains on the sheriff, not on the employer, and nothing in our ruling here changes that. *See Peterson v. Fred Vogt & Co.*, 495 N.W.2d 875, 879 (Minn. App.1993) (weighing, as a factor in determination that employee did not commit misconduct, employer's failure to make "even a minimal attempt to accommodate" employee by signing a statement necessary for employee to continue work as a driver).

We hold that under the facts presented, Jenkins' absence from work was not misconduct that disqualified her from receiv-

ing unemployment benefits. The court of appeals' decision is reversed.

Reversed.

ANDERSON, G. BARRY, Justice (concurring).

I concur with the result.

GILDEA, Justice (dissenting).

I respectfully dissent. Jenkins' employer had a *right* to reasonably expect that Jenkins would show up for work each day that she was scheduled. Jenkins did not show up for work because she was in jail for committing a crime. In my view, Minnesota law does not entitle Jenkins to unemployment benefits.

The starting point for this statutory interpretation case is the cardinal rule that we must construe the statute so as to give effect to all of its provisions. *Smith v. Barry*, 219 Minn. 182, 187, 17 N.W.2d 324, 327 (1944) ("We have held that a statute is to be construed as a whole so as to harmonize and give effect to all of its parts."). The "public purpose" of Minnesota's unemployment insurance program is to provide temporary financial support to workers who lose their jobs *"through no fault of their own."* Minn.Stat. § 268.03, subd. 1 (2004) (emphasis added). We have said that "we cannot ignore the statement of public policy" in determining whether benefits are available under the statute. *Grushus v. Minnesota Mining & Mfg. Co.*, 257 Minn. 171, 175, 100 N.W.2d 516, 519 (1960).[1] While the majority acknowledges the legislative purpose, the result the ma-

jority reaches ignores it. Jenkins did not lose her job "through no fault of her own." She lost her job because she did not show up for work.

The misconduct provision in the statute is easily read so as to give effect to the legislative purpose. Under the statute, an employee who commits misconduct is not entitled to benefits. *See* Minn.Stat. § 268.095, subd. 4(1) (Supp.2003). The statute defines misconduct as "any intentional, negligent, or indifferent conduct, on the job or off the job (1) that evinces a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee * * *." Minn.Stat. § 268.095, subd. 6(a) (Supp. 2003). The standard of behavior at issue in this case is showing up for work. There is no dispute that an employer's expectation that its employees show up for work is reasonable. There likewise is no dispute that Jenkins violated this standard of behavior. She was discharged because she did not come to work for six straight days. Thus, under the plain language of Minn. Stat. § 268.095, subd. 6(a), Jenkins' absence from work was employee misconduct and she is therefore "ineligible for any unemployment benefits." Minn.Stat. § 268.095, subd. 4.

Rather than follow the plain language, the majority's inquiry ignores the statutory phrase "has the right to" included in Minn.Stat. § 268.095, subd. 6(a). As a result, the majority mistakenly contends that the proper inquiry under the statute is whether "the employer's expectation for the employee [was] reasonable under the

---

1. The majority relies on the discussion of "good cause" in *Grushus* and the discussion of the employee's "good faith efforts" in *Prickett*. In my view, such discussion has no relevance under the current version of the statute. As we have noted, prior to 1997, "employment misconduct was undefined by statute." *Houston v. Int'l Data Transfer Corp.*,

645 N.W.2d 144, 149 (Minn.2002). In contrast to *Grushus* and *Prickett*, the question before us in this case does not require that we utilize common law definitions of "misconduct." The legislature has provided the definition in the statute and our only task is to apply that definition.

circumstances." In posing and then responding to this question, the majority does not give effect to all of the parts of the statute in a manner that is either consistent with the statute as a whole or consistent with our precedent.

The majority, in essence, concludes that the employer forfeited its "right" to expect that Jenkins would come to work because the employer did not verify her employment status with the jail even though Jenkins' supervisor told her the employer would do this. But Minnesota law places no duty on employers to verify employment. *See* Minn.Stat. § 631.425, subd. 3 (2004) .("If the person committed under this section has been regularly employed, the sheriff shall arrange for a continuation of the employment insofar as possible without interruption."). Whatever we may think about Jenkins' supervisor's statements, we are not evaluating whether Jenkins should have been terminated or whether it was "fair" for her employer to terminate her. *See Ress v. Abbott Northwestern Hosp., Inc.,* 448 N.W.2d 519, 523 (Minn.1989) ("The issue in this action is not whether Abbott should have terminated Nurse Ress, but whether, now that he is unemployed, he should be denied unemployment compensation"). This is especially so because the legislature has specifically provided that "[t]here shall be no equitable or common law * * * allowance of unemployment benefits." Minn.Stat. § 268.069, subd. 3 (2004).

Jenkins' employer had the right to reasonably expect that Jenkins would show up for work. When Jenkins did not show up for six straight days, her absence was employee misconduct and she is not entitled to unemployment benefits.

I would affirm.