WATERMAN, Justice
(concurring in part and dissenting in part).
I respectfully dissent in part. I agree with the majority’s conclusion that Irving’s misconduct termination from her part-time job with employer Solon Nursing disqualified her from unemployment benefits for that position alone.[4] But I would affirm *212 the district court and agency determination that Irving was properly denied unemployment benefits for missing three weeks of work without her employer’s permission while she was incarcerated on charges of felony domestic abuse and making a false report calling 911. Iowa employers are entitled to expect their employees to show up for work. Being in jail is not a valid excuse for missing work.
The Administrative Law Judge (ALJ) who conducted the evidentiary hearing found that Irving violated her employment contract:
The claimant did not have any available vacation hours and would have had to request a leave of absence in advance of the leave, in accordance with the union contract. The employer concluded the claimant effectively resigned after she was absent from duty for three consecutive work days without proper notification and authorization.
The Employment Appeal Board (EAB) and district court accepted the ALJ’s finding. We are bound by the agency’s findings of fact that are supported by substantial evidence. Dico, Inc. v. Iowa Emp’t Appeal Bd., 576 N.W.2d 352, 354 (Iowa 1998). Two witnesses for her employer, the University of Iowa Hospitals and Clinics (UHIC), testified that Irving was required under her employment contract to submit requests for a leave of absence thirty days in advance, which Irving failed to do. Reliable attendance is especially important in Irving’s job as a medical assistant at a hospital. Irving failed to show up for work or obtain authorization for her absences during the three weeks preceding her termination. Substantial evidence supports the agency’s finding that her prolonged unexcused absence violated her employment contract. That factual finding should be dispositive.
The EAB determined Irving was disqualified from receiving unemployment benefits for her UIHC job on three separate grounds: (1) her incarceration, deemed a voluntary quit under Iowa Administrative Code rule 871 — 24.25(16); (2) her absence for three days without notice, deemed a voluntary quit under rule 871— 24.25(4); and (3) her excessive unexcused absenteeism, deemed misconduct under rule 24.32(7). The district court correctly affirmed on all three grounds. The majority errs by reversing on all three grounds.
The majority substitutes its own policy choice, that someone unable to make bail deserves unemployment benefits, for the eligibility determination of the agency charged with administering Iowa’s complex statutory scheme for unemployment benefits. The agency in 1975 promulgated an administrative rule providing that- persons who miss work due to incarceration are disqualified from receiving unemployment benefits. Iowa Admin. Code r. 370-4.25(16) (1975). I would not second-guess that commonsense determination. The incarceration rule has been on the books and enforced by the agency for four decades without challenge.[5] See id. r. 871— *213 24.25(16) (2016). The legislature, apparently satisfied with that rule, has. repeatedly amended chapter 96 to add other exceptions and qualifications for the receipt of unemployment benefits while leaving the incarceration rule intact. See, e.g., 2010 Iowa Acts ch. 1048, § 1; 1997 Iowa Acts ch. 132, § 1. “We consider, the legislature’s inaction as a tacit approval of the [agency’s] action.” City of Sioux City v. Iowa Dep’t of Revenue & Fin., 666 N.W.2d 587, 592 (Iowa 2003) (“The fact that this administrative rule has been, in effect for eleven years strongly cautions against finding the rule invalid.”). Of course, the legislature is free to overrule today’s judicial policy choice requiring benefits for job loss attributable to incarceration.
The majority fails to strike the proper balance when interpreting chapter 96. We have previously recognized that chapter 96 strikes a balance between providing benefits for “ ‘persons unemployed through no fault of their own’ ... and fundamental fairness to the employer, who must ultimately shoulder the financial burden of any benefits paid.” White v. Emp’t Appeal Bd., 487 N.W.2d 342, 345 (Iowa 1992) (quoting Iowa Code § 96.2 (1991)). In Messina v. Iowa Department of Job Service, we observed,
The unemployment compensation statute ... touches upon more than just the recipient. It provides for the creation of a fund produced by contributions from private employers. The rate of an employer’s contribution to the fund varies according to benefits paid to that employer’s eligible employees. Any action with regard to disbursements from the unemployment compensation fund thus will affect both the employer and the fiscal integrity of the fund.
341 N.W.2d 52, 62 (Iowa 1983) (quoting Ohio Bureau of Emp’t Servs. v. Hodory, 431 U.S. 471, 490, 97 S.Ct. 1898, 1909, 52 L.Ed.2d 513, 529 (1977)). We noted the legislative goal of attracting and retaining job-creating industries is thwarted when “employees discharged for misconduct nonetheless are paid unemployment benefits from funds extracted from employers.” Id. We stated,
The fiscal integrity of the fund should not be jeopardized by payments to employees ... discharged for [misconduct]. This would strike at the expressed state interest disclosed by the legislature in creating the fund [to] ... “benefit ... persons unemployed through no fault of their own.”
Id. (quoting Iowa Code § 96.2 (1983)). Today’s decision may give employers and prospective employers pause. Some may become more reluctant to hire people viewed as being at risk of incarceration, such as persons who already have criminal records or records of arrests.
The majority undermines our “personal responsibility” precedents that disqualified claimants who were repeatedly late for work due to child care or transportation problems. I would honor stare decisis and follow our precedent to hold that Irving’s three-week unexcused absence from work for personal reasons disqualified her from unemployment- benefits. In Cosper v. Iowa Department of Job Service, we held that excessive unexcused absences can be disqualifying misconduct. 321 N.W.2d 6, 10 (Iowa 1982). The agency promulgated an administrative. rule based on Cosper:
*214 Excessive unexcused absenteeism. Excessive unexcused absenteeism is an intentional disregard of the duty owed by the claimant to the employer and shall be considered misconduct except for illness or other reasonable grounds for which the employee was absent and that were properly reported to the employer.
Iowa Admin. Code r. 871 — 24.32(7). “[AJbsenteeism arising out of matters of purely personal responsibilities” is not excusable. Higgins v. Iowa Dep’t of Job Serv., 350 N.W.2d 187, 191 (Iowa 1984).
We considered a case of “purely personal responsibilities” in Higgins. Id. Barbara Higgins was employed by United Parcel Service. Id. at 189. In her last six months at UPS, she began to accumulate absences, and Higgins’s supervisor reviewed her absences with her. Id. When she failed to report to work or give a reason on. April 16, 1982, she was placed on a thirty-day probation. Id. Her probation required her to “be on time every day in the future and in attendance every day to avoid further disciplinary action.” Id. On May 24, she was a few minutes late and told her supervisor the babysitter was late. Id. On June 2, she was fifteen minutes late because she overslept. Id. Higgins was fired on June 4. Id. Higgins sought unemployment benefits, and her claim was denied. Id. We affirmed the denial of benefits. Id. at 192. We held her absences were excessive and unexcused. Id. at 190-91. We said, “Oversleeping cannot be deemed a ‘reasonable ground’ for missing work.” Id. at 191. Although the agency had found the absences due to Higgins’s babysitter problems were excused, we disagreed, concluding that absenteeism caused by unreliable child care or transportation is not excusable. Id.
In a case filed the same day, we affirmed the agency’s denial of benefits in Harlan v. Iowa Department of Job Service, 350 N.W.2d 192, 195 (Iowa 1984). Judith Harlan was employed at Younkers Brothers, Inc. for three years. Id. at 193. She received warnings in 1981 and 1982 regarding her tardiness. Id. at 194. In 1981, she told her employer she had car problems that required her to rely on public transportation. Id. After the warning in 1982, Harlan was late ten times over the course of about four months. Id. She arrived at work on those days from ten to sixty minutes after the start of her scheduled shift. Id. She frequently failed to give advance notice when she would be late. Id. Her tardiness made it difficult for her supervisors to adequately cover her department. Id. Harlan was discharged in May 1982 for excessive tardiness. Id. at 193. At the agency hearing, the hearing officer acknowledged that some of Harlan’s tardiness was explainable due to issues with weather and public transportation, but Harlan was tardy in the late spring when weather was not an issue. Id. at 194. Moreover, Harlan had the option of taking an earlier bus. Id. These factors made her habitual tardiness disqualifying misconduct. Id.
Notably, we did not consider the individual’s financial circumstances, such as an inability to afford child care or a reliable vehicle, in holding the absences from work constituted disqualifying misconduct. Nor should we expect the EAB or employers such as UIHC to assess an employee’s financial ability to make bail or the likelihood charges will be dismissed in determining whether incarceration excuses an extended absence from work. I defer to the elected branches to make these policy choices. It is for the legislative and executive branches to decide whether Iowa is better off with a more lenient system of unemployment compensation — which results in higher premiums and higher costs of hiring employees — or a less lenient sys *215 tem that does not allow persons who missed work due to being in jail to collect benefits.
Irving’s absenteeism is analogous to Higgins and Harlan. She was scheduled to work eight-hour shifts and missed ten work days in a row. Irving’s employer did not authorize her absence as required under the union contract. If being late repeatedly due to babysitter problems, a late bus, oversleeping, or car trouble is disqualifying misconduct regardless of the employee’s financial circumstances, so too is missing work for ten shifts in a row due to an arrest and incarceration after a domestic dispute.
The majority relies on Roberts v. Iowa Department of Job Service, 356 N.W.2d 218, 222-23 (Iowa 1984), which I find readily distinguishable. Lanelle Roberts missed work when she was hospitalized for treatment of mental illness (schizophrenia, paranoid type). Id. at 219-20. Her employer fired her for excessive absenteeism, and she filed for unemployment benefits, which were denied based on the agency rule for excessive absenteeism.[6] Id. at 220. The district court affirmed, but we reversed, concluding that her absences due to her incapacitating mental illness did not constitute disqualifying misconduct. Id. at 222. We noted that she had not violated her company’s policy that authorized termination after three days’ unreported absence. Id. at 221-22. We found the record “established] as a matter of law that she was ‘unable [to] protect her own interests at that time, in particular, she was unable to call her employer each day to report her absence.’ ” Id. at 222. We relied on testimony of her treating physician that her “serious mental condition” rendered her unable to communicate. Id. I do not equate Irving’s incarceration on charges of domestic abuse with an incapacitating illness. Irving’s case is more like Higgins and Harlan than Roberts.
Courts in other jurisdictions have held that unexcused absences attributable to incarceration disqualify claimants from unemployment benefits even when benefits are allowed for absences due to illness. A New Jersey appellate court'concluded that incarceration was not analogous to an illness causing excusable absenteeism. Fennell v. Bd. of Review, 297 N.J.Super. 319, 688 A.2d 113, 115 (1997). The majority mislabels Fennell as an “outlier” without acknowledging • many other • decisions reaching the same result. See, e.g., Bivens v. Allen, 628 So.2d 765, 766-67 (Ala.Civ.App.1993); Weavers v. Daniels, 1 Ark.App. 55, 613 S.W.2d 108, 109-10 (1981); Camara v. Marine Lubricants, No. N12A-05011-DCS, 2013 WL 1088334, at *3-4 (Del.Super.Ct. Feb. 25, 2013); In re Karp, 262 A.D.2d 925, 692 N.Y.S.2d 516, 517 (1999); Beatty v. Unemployment Comp. Bd. of Review, No. 1331 C.D. 2008, 2009 WL 9097018, at *2 (Pa.Commw.Ct. Jan. 28, 2009).
Fennell fits like a glove with Iowa’s “personal responsibility” cases. Ricky Fennell, a hospital employee, was jailed for nine months on pending assault charges. Fennell, 688 A.2d at 113. He was unable to make bail and “made all reasonable efforts to get his employer to hold his job open until his release.” ’ Id. at 113-14. He was terminated after missing work for three months and applied for unemployment benefits after the hospital declined to rehire him upon his release from jail. Id. at 114. The agency “upheld .the denial of *216 benefits because [his] reason for leaving his job was incarceration, a personal problem not attributable to work.” Id. The appellate court affirmed, stating,. ■
Here appellant’s reason for leaving work, was his personal problem, incarceration on criminal charges and his inability. to raise enough money to post bail. These unfortunate economic and legal problems were not related to his employment. Nor. is an employee’s intent to quit either relevant or controlling, unless the judicially-created exception for illness is implicated. ■
Id at 115. The Fennell court declined to apply New Jersey precedent — that state’s counterpart to Roberts — allowing benefits when the absence from work is attributable to illness. Id. at 114-15. While noting a split in authority, the Fennell court noted, “Other jurisdictions routinely deny claims [for unemployment benefits] where incarceration causes an absence from employment.” Id. at 116 (collecting cases).
Similarly, a Delaware court recently equated incarceration for a domestic dispute to a personal matter:
Appellant informed the Board that his arrest was generated by a personal matter — his wife called the authorities. The Court does not intend to delve into the domestic relations between Appellant and his wife; however, there can be nothing more personal than matters of the home. So, too, strained domestic relations are beyond the employer’s control, Thus, the Board determined that ,.. Appellant’s incarceration was personal and not work related and, therefore, Appellant had voluntarily left his employment,
Camara, 2013 WL 1088334, at *3; see also Bivens, 628 So.2d at 766-67 (holding claimant incarcerated for seven days was not entitled to benefits); Weavers, 613 S.W.2d at 109-10 (holding employee incarcerated and -unable to post bail was properly denied unemployment benefits for misconduct); Karp, 692 N.Y.S.2d at 517 (holding claimant who was arrested and did not post bail committed disqualifying misconduct); Beatty, 2009 WL 9097018, at *2 (collecting cases and observing that “[i]t is well established that incarceration is not a reasonable or justifiable absence from work”). I find these authorities persuasive.
Irving argues she was innocent of the charge of domestic abuse, pointing to her partner’s recantation months later. It is unclear whether the majority relies on her innocence, the lack of a conviction, or her inability to post bail to require benefits. We recently reiterated that victims often recant in domestic abuse cases. State v. Smith, 876 N.W.2d 180, 187-88 (Iowa 2016) (citing authorities concluding that many victims recant); id. at 194 (Waterman, J. dissenting) (citing additional authorities estimating “[t]he rate of recantation among domestic violence victims [is] ... between eighty and ninety percent”). Employers and the EAB should not be put in the untenable position of determining the actual guilt or innocence of jailed employees or whether voluntary conduct landed them in jail,[7] As other courts have concluded, actual innocence is irrelevant to *217 the fact the employee is not showing up for work. See, e.g., In re Bishop, No. A-6222-06T1, 2009 WL 36444, at *3 (N.J.Super.Ct.App.Div. Jan. 8, 2009) (“Bishop’s absence from work for more than sixty days is undisputed. That he was incarcerated on charges that were eventually dismissed is irrelevant since his custodial confinement was unrelated to this employment.”). A Delaware court aptly observed,
Public policy ... does not support the theory that an employee is available for work while incarcerated and that such a situation requires an employer to hold the job for someone who is indefinitely absent. The purpose of having an employee is for them to work. To require that employers keep a job open for those employees who become incarcerated or risk having to pay unemployment benefits is unreasonable and against ... public policy_
Mason v. Best Drywall, No. C.A. 98A-07-005-RSG, 1999 WL 459303, at *3 (Del.Super.Ct.1999) (footnote omitted).
I disagree with the majority that Minnesota caselaw supports Irving. In Jenkins v. American Express Financial Corp., a divided Minnesota Supreme Court adopted a fact-specific, case-by-case approach and concluded the employer’s unfulfilled promise to verify Jenkins’s employment for work release prevented her from continuing to work and entitled her-to unemployment benefits. 721 N.W.2d 286, 290-92 (Minn.2006). Jenkins is distinguishable because it is undisputed that UIHC played no role in Irving’s initial incarceration or its duration. Moreover, the Jenkins dissent concluded that not showing up for work is disqualifying misconduct. Id. at 294 (Gildea, J., dissenting). Quoting the purpose of the Minnesota Act, the dissent stated, “Jenkins did not lose her job ‘through no fault of her own.’ She lost her job because she did not show up for work.” Id. (quoting Minn.Stat. § 268,03, subdiv. 1 (2004). I agree with the dissent.)
Significantly, Minnesota appellate courts after Jenkins have routinely held that persons missing work due to incarceration are disqualified from unemployment benefits. See, e.g., Luhman v. Red Wing Shoe Co., No. A14-1193, 2015 WL 134211, at *3 (Minn.Ct.App. Jan. 12, 2015) (affirming denial of benefits when employee missed three workdays due to incarceration); Millis v. Martin Eng’g Co., No. A11-2085, 2012 WL 3892191, at *2 (Minn.Ct.App. Sept. 10, 2012) (“An employer has a right to expect an employee to work when scheduled.”); LaValla v. Am. Red Cross Blood Servs., No. A11-782, 2012 WL 1380327, at *3 (Minn.Ct.App. Apr. 23, 2012) (rejecting chemical dependency excuse for incarceration); Miller v. SDH Educ. W., LLC, No. A08-1169, 2009 WL 1684442, at *2 (Minn.Ct.App. June 16, 2009) (“When an employee misses work because of incarceration, ordinarily his absenteeism is deemed to be his own fault and to constitute employment misconduct.”). Even under Minnesota’s case-by-case, fact-specific approach, Irving is disqualified based oh the agency finding that her extended absence from her job at the UIHC was unauthorized by her employer.
Today’s decision replaces a clear rule with uncertainty. It remains to be seen whether everyone unable to. make bail will be entitled to collect unemployment benefits for the resulting job loss, or only those who avoid a conviction. The majority leaves employers guessing.
For these reasons, I dissent in part.
MANSFIELD and ZAGER, JJ., join this special concurrence in part and dissent in part.

. Solon Nursing terminated Irving for misconduct when she failed to report her arrest within forty-eight hours as required for her position caring for disabled, dependent patients. The legislature specifically provided that a termination for gross misconduct cancels wage credits earned from "all employers.” Iowa Code § 96.5(2)(b) (2013); By contrast, the legislature did not expressly provide that a termination for misconduct from a part-time position, without a finding of gross misconduct, by itself disqualifies the ihdividu *212 al for benefits for the loss of a job with a different employer. Presumably,' if the legislature intended the misconduct disqualification for benefits in section 96,5(2)(a) to extend to all employers, it would have said so as ■it did for wage credits based on gross misconduct in the next paragraph. See Oyens Feed & Supply, Inc. v. Primebarik, 808 N.W.2d 186, 193-94 (Iowa 2011) (concluding the fact that a phrase was “selectively incorporated" in certain provisions showed the legislature’s omission of that phrase in a related provision was intentional).

. I recognize that .we do not generally regard the status of being incarcerated as "voluntary,” -However, the agency and the legislature were certainly entitled to conclude that incarceration in most cases results from voluntary conduct on the part of the incar *213 cerated person. With a few commonsense exceptions, our unemployment compensation statute holds people responsible for getting to work and does not accept excuses such as car trouble, bad weather, or child-care issues. Being in jail is not one of those commonsense exceptions.

. The administrative rule in effect at the time of Roberts’s denial of benefits stated,
Excessive absenteeism. Excessive absenteeism is an intentional disregard of the duty owed by the claimant to the employer and shall be considered misconduct.
Roberts, 356 N.W.2d at 222 (quoting Iowa Admin. Code r. 370 — 4.32(7) (1984)).

. Federal regulations require prompt determinations on eligibility for unemployment benefits, See IoWa Code § 96.11(10) (2013) (“[T]he department shall cooperate with the United States department of labor to the fullest extent consistent with the provisions of this chapter_”). ■ In, order to comply with federal regulations, the state must issue sixty percent of first-level benefit appeal decisions within thirty days of the date of appeal and at least eighty percent of first-level benefit appeal decisions within forty-five days. 20 C.F.R. § 650.4(b) (2013). Needless to say, the wheels of justice often spin more slowly in criminal cases.