STATE OF MINNESOTA

IN SUPREME COURT

A15-0435

Court of Appeals                                                           Gildea, C.J.
                                                  Dissenting, Chutich, Lillehaug,
                                                              and Hudson, JJ.

Nina Wilson,

                              Respondent,

vs.                                                              Filed:  December 28, 2016
                                                              Office of Appellate Courts

Mortgage Resource Center, Inc.,

                              Respondent,

Department of Employment and Economic
Development,

                              Appellant.

_____

Thomas H. Boyd, Kyle R. Kroll, Winthrop & Weinstine, P.A., Minneapolis, Minnesota, for respondent Nina Wilson.

Lee B. Nelson, Minnesota Department of Employment and Economic Development, Saint Paul, Minnesota, for appellant.

Charles H. Thomas, Paul Onkka, Southern Minnesota Regional Legal Services, Inc., Saint Paul, Minnesota, for amicus curiae Southern Minnesota Regional Legal Services, Inc.

_____

1

1.     Because the statutory definition of "employment misconduct" in Minn. Stat. § 268.095, subd. 6(a) (2016), is the exclusive definition for determining employee eligibility for unemployment benefits, the court of appeals erred in applying an incompatible common law materiality definition.

2.     Because respondent Wilson's misrepresentations on her employment application constitute "employment misconduct" under section 268.095, subdivision 6(a), she is not eligible for unemployment benefits.

Reversed.

## O P I N I O N

GILDEA, Chief Justice.

In this case, we are asked to decide what qualifies as "employment misconduct" under the Minnesota Unemployment Insurance Law.   Minn. Stat. ch. 268 (2014). Concluding that respondent Nina Wilson was discharged for "employment misconduct" under Minn. Stat. § 268.095, subd. 4 (2016), an Unemployment Law Judge (ULJ) determined that she was ineligible for unemployment benefits.   The court of appeals reversed, applying its own precedent to conclude that Wilson's conduct did not constitute employment misconduct.   *Wilson v. Mortg. Res. Ctr., Inc.*, No. A15-0435, 2015 WL 9264038, at *2 (Minn. App. Dec. 21, 2015).   Because we conclude that the court of appeals applied an improper definition of "employment misconduct" and that under the proper definition, Wilson's conduct was "employment misconduct," we reverse.

Nina Wilson applied for employment as a Client Services Representative with Mortgage Resource Center, Inc. (MRC) on June 6, 2014. MRC is an electronic information provider that offers online manuals and educational services to the mortgage and banking industry. The "primary purpose" of the client services position was to "handl[e] incoming customer service and sales inquiries, [and] various product fulfillment activities." The person hired would also have been responsible for "end-user product support, moderately complex technical support, invoicing support, order placement and lead qualification." The position required, among other things, a "2 or 4 year undergraduate degree or equivalent experience" and "[a]t least 5 years of account management or customer service experience."

On Wilson's application, she circled "12" as her highest grade completed, and wrote that she had received a GED (general educational development diploma) from the "MN Educational Center" in Minneapolis.[1] She also noted that she had almost 20 years of relevant experience. On the last page of the application, above the signature line, MRC required its applicants to attest that "the answers given by me to the foregoing questions and any statements made by me are complete and true to the best of my knowledge and belief." That section also required applicants to certify that "I understand that any false information, omissions, or misrepresentations of facts regarding information called for in this application may result in rejection of my application, or discharge at any time during

---

[1] The ULJ found that Wilson had an 11th grade education. In her testimony to the ULJ, Wilson stated that she could not recall writing that she had a GED on her application. Wilson also testified that she took the GED exam, but that she could not remember if she passed or had received a GED diploma.

3

my employment." Similar language appeared on the first page of the application. An applicant's signature also authorized MRC to order a background check. Wilson signed the application.

MRC offered Wilson the client services position on June 9, 2014, "contingent upon the successful result of this background search." The next day, MRC ordered a background check from a third party provider. On June 17, 2014, the third party provider returned a report to MRC stating that it could not verify that Wilson had received a GED. Wilson began her employment on June 23, 2014.

In mid-August, MRC noticed, as it reviewed its files as part of the process of being acquired by another company, that the background check had not verified Wilson's GED. MRC's human resources manager attempted to verify Wilson's GED by contacting state officials but was not able to confirm that Wilson had received a GED.

On September 10, 2014, MRC sent a letter via e-mail to Wilson stating that it had been unable to verify her GED and asking her to submit documentation no later than September 17, 2014, proving that she had received a GED. The letter informed Wilson that if she did not reply by the deadline, MRC would "proceed under the assumption that the representation in [her] application was not accurate." Wilson, who was on medical leave at the time, did not respond. She testified that she received the letter but did not respond to MRC's request because of her health condition.

On September 19, 2014, MRC sent Wilson a second letter via e-mail terminating her employment. The termination letter stated that because Wilson did not respond to MRC's September 10 letter, the company assumed the representation she made in her application was "not accurate," and her employment was terminated effective immediately.

As noted on the job application, MRC had a policy of terminating employees who provided false information on their employment applications. MRC's president testified that other employees had been terminated for violating this policy. For MRC, he stated, "[i]t's an integrity and character issue."

Wilson applied for unemployment benefits with the Department of Employment and Economic Development (DEED), the department charged with administering and supervising the unemployment insurance program under Minn. Stat. § 116J.401, subd. 2(a)(18) (2016). DEED issued a Determination of Eligibility, finding that Wilson was discharged during the week of August 3, 2014, because of a medical condition, illness, or injury, and so was eligible to receive unemployment benefits.[2] MRC appealed.

Following a telephonic hearing, the ULJ issued findings of fact and a decision concluding that MRC discharged Wilson, "in large part,"[3] because of its concern about her

---

[2]     During Wilson's medical leave, MRC informed her that it was starting the process of hiring a replacement and that her position might not be available when she was medically able to return to work.

[3]     Under Minn. Stat. § 268.095, subd. 4(1), "[a]n applicant who was discharged from employment . . . is ineligible for all unemployment benefits . . . if (1) the applicant was discharged *because of* employment misconduct." (Emphasis added.) Wilson does not argue that the language used by the ULJ is inconsistent with the causation standard under the statute. As a result, we do not consider that question.

5

"false statements" about receiving a GED. The ULJ determined that Wilson's misrepresentations that she had received a high school "degree" were employment misconduct and concluded that she was ineligible for unemployment benefits. Wilson filed a request for reconsideration, after which the ULJ affirmed his findings of fact and conclusions of law.

Wilson appealed to the court of appeals, relying on that court's precedent that pre-dated Minnesota's codification of a definition of "employment misconduct." Under that precedent, a misrepresentation on an application is employment misconduct only when it is material to the position. In other words, to be ineligible for benefits under the court of appeals' rule, the evidence must show that the employer would not have hired the employee had the employer known the truth about the matter the employee misrepresented on the application. *See, e.g.*, *Indep. Sch. Dist. No. 709 v. Hansen*, 412 N.W.2d 320, 323 (Minn. App. 1987).

Following this precedent, the court of appeals reversed the ULJ. The court reasoned that conduct during the hiring process is analyzed differently than conduct during employment. *Wilson*, No. A15-0435, 2015 WL 9264038, at *1. In particular, the court held that MRC failed to meet its burden of showing that it would not have hired Wilson had it known the truth about her lack of a GED. The court also concluded that MRC did not otherwise demonstrate how a GED was material to the position for which Wilson applied. *Id.* Because the court determined that MRC did not terminate Wilson for

6

"employment misconduct," the court held that she was entitled to unemployment benefits. *Id.* We granted DEED's petition for review.[4]

On appeal, DEED argues that the court of appeals erred in reversing the ULJ's conclusion that Wilson engaged in employment misconduct. Specifically, DEED contends that the materiality standard the court of appeals applied is inconsistent with the statutory definition of "employment misconduct" in Minn. Stat. § 268.095, subd. 6 (2016). When the statutory definition is applied, DEED argues that Wilson committed employment misconduct and therefore she is not eligible for unemployment benefits.

We first determine whether, as DEED argues, the court of appeals erred in how it defined "employment misconduct." After we determine the applicable definition, we examine whether Wilson's actions meet that definition.

I.

We turn first to the definition of "employment misconduct." DEED relies on the definition in the statute. The statute provides that an employee discharged because of "employment misconduct" is not eligible for unemployment benefits.[5] Minn. Stat.

---

[4] Under Minn. Stat. § 268.105, subd. 7(e) (2016), DEED is "considered the primary responding party to any judicial action involving [a ULJ's] decision." DEED plays a primary role because unemployment benefits are paid from state funds, which the agency administers, and not by an employer. Minn. Stat. § 268.069, subd. 2 (2016). In this case, DEED petitioned for review, while Respondent Mortgage Resource Center did not participate in the appeal to our court.

[5] In its amicus brief, Southern Minnesota Regional Legal Services (SMRLS) argues that the plain text of the statute, because it refers to "employee" and "employer," does not apply to conduct that occurred before the employment relationship was formed, such as completing a job application. Wilson briefly echoes the same contention. Amici are not permitted to raise new issues on appeal. *See In re Minnegasco*, 565 N.W.2d 706, 713

7

§ 268.095, subd. 4(1). The statute specifically defines "employment misconduct" as "any intentional, negligent, or indifferent conduct, on the job or off the job that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee." Minn. Stat. § 268.095, subd. 6(a)(1).[6]

Wilson acknowledges the statutory definition but she contends that the court of appeals' materiality standard is applicable to her situation. The materiality standard has its origins in *Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374-75, 204 N.W.2d 644, 646 (Minn. 1973), a case we decided before the Legislature adopted a statutory definition of "employment misconduct." Act of Apr. 23, 1997, ch. 66, § 49, 1997 Minn. Laws 357, 387.[7]

---

(Minn. 1997) (declining to address issues not raised below); *see also Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 898 n.7 (Minn. 2006) (declining to reach issues raised in the amicus curiae brief because they were not decided by the lower courts). But even if this issue was properly before us, it has no merit because Wilson's conduct was not confined to the employment application process. After Wilson began her employment, MRC asked her to confirm her representation that she had received a GED. Wilson did not respond or take any other action to correct her misrepresentations about her educational background.

[6]     The statute also defines "employment misconduct" as "(2) a substantial lack of concern for the employment." Minn. Stat. § 268.095, subd. 6(a)(2). Because we conclude, as explained below, that Wilson's misrepresentations about her education meet the first definition of "employment misconduct," we do not consider whether those misrepresentations also meet the second.

[7]     The definition adopted by *Tilseth* read:

> [T]he intended meaning of the term "misconduct" . . . is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability,

8

The court of appeals relied on our discussion of misconduct in *Tilseth* in crafting the materiality standard. *See Heitman v. Cronstroms Mfg., Inc.*, 401 N.W.2d 425, 427 (Minn. App. 1987); *see also Hansen*, 412 N.W.2d at 323. In *Heitman*, the court of appeals determined that misrepresentations during the hiring process should be analyzed differently from other types of misconduct. 401 N.W.2d at 427-28. Specifically, the court concluded that a misrepresentation made during the application process must be "material to the position obtained" for the misrepresentation to constitute misconduct under the statute. *Id.* at 427. And in *Hansen*, the court of appeals applied *Heitman* and held that a misrepresentation is material to a position if a truthful answer to the question would have prevented the applicant from being hired. 412 N.W.2d at 322-23.

---

> wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed "misconduct" . . . .

*Tilseth*, 295 Minn. at 374-75, 204 N.W.2d at 646 (citation omitted) (internal quotation marks omitted). In prior cases, we have declined to reach the question of whether the statutory definition of "employment misconduct" supersedes the *Tilseth* definition. In *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 806 (Minn. 2002), the Commissioner of Economic Security argued that the statutory definition was "less restrictive" than the *Tilseth* standard and that the statute therefore "superseded" the *Tilseth* standard. *Id.* We noted that the Commissioner had not raised that issue below and that we did not need to address it because the employee's conduct met what the commissioner described as the more restrictive *Tilseth* standard. *Id.* The issue was also raised in *Houston v. Int'l Data Transfer Corp.*, 645 N.W.2d 144, 149 (Minn. 2002), but we did not reach it.

DEED argues that under the explicit terms of the statute, no other definition of "employment misconduct," including prior common law definitions, can apply. Wilson, on the other hand, contends that the court of appeals did not err in applying its prior case law because the materiality standard remains instructive in situations in which the common law framework and the statutory definition overlap.

The parties' dispute presents a question of statutory interpretation that we review de novo. *Great River Energy v. Swedzinski*, 860 N.W.2d 362, 364 (Minn. 2015). If the meaning of a statute is unambiguous, the plain language of the statute controls. Minn. Stat. § 645.16 (2016). A statute's words are interpreted according to their common everyday meaning, Minn. Stat. § 645.08(1) (2016), which we often determine with the aid of dictionary definitions, *see Shire v. Rosemount, Inc.*, 875 N.W.2d 289, 292 (Minn. 2016).

Based on the plain language of the statute, DEED has the better argument on the meaning of "employment misconduct." Specifically, the statute states that its definition of "employment misconduct" is "exclusive and no other definition applies." Minn. Stat. § 268.095, subd. 6(e) (2016); *see Stagg v. Vintage Place, Inc.*, 796 N.W.2d 312, 316 (Minn. 2011) (noting that the statutory definition is exclusive); *Jenkins v. Am. Express Fin. Corp.*, 721 N.W.2d 286, 290 (Minn. 2006) (same). The statute also notes that there is "no equitable or common law denial or allowance of unemployment benefits." Minn. Stat. § 268.069, subd. 3 (2016). Notwithstanding the statute's plain language, the court of appeals applied a conflicting common law definition that pre-dates the codification of the statutory definition. *Wilson*, No. A15-0435, 2015 WL 9264038, at *1-2. This was error.

10

The court of appeals also erred when it stated that misrepresentations made during the employment application process should be analyzed under a different test. *Id.* at *1 (citing *Icenhower v. Total Auto., Inc.*, 845 N.W.2d 849, 856 (Minn. App. 2014)). Nothing in the statute supports applying a different test to different types of misconduct. The statutory definition is expressly exclusive, Minn. Stat. § 268.095, subd. 6(e), meaning that it applies to all types of situations.

Because the statutory definition is exclusive, a prior common law standard that is incompatible with the statutory language is inapplicable. The common law materiality standard is inconsistent with the statute because materiality, as the court of appeals applied it, requires a different inquiry. *See Stagg*, 796 N.W.2d at 316 (reversing the court of appeals on the grounds that its analysis failed to "comport with the exclusive definition" of employment misconduct in the statute). Specifically, the court required a but-for causation determination: an applicant's misrepresentation is only material, and thus constitutes employment misconduct, if but for the misrepresentation, the applicant would not have been hired. *Hansen*, 412 N.W.2d at 322-23; *see also Santillana v. Cent. Minn. Council on Aging*, 791 N.W.2d 303, 308 (Minn. App. 2010) (finding employment misconduct where the evidence showed that it was unlikely that the employer would have hired the applicant had she disclosed the real reason for her separation from her former employer).

A but-for causation analysis, however, is beyond what the plain terms of the statute require. Under the statute, a misrepresentation is employment misconduct when it clearly displays a "serious violation" of the behavior an employer has the right to reasonably

11

expect. Minn. Stat. § 268.095, subd. 6(a). The common meaning of "serious" is synonymous with "important." *Merriam-Webster's Collegiate Dictionary* 1066 (10th ed. 2001) (defining "serious" as "of or relating to a matter of importance"); *see also The American Heritage Dictionary* 1648 (3d ed. 1996) (defining "serious" as "[c]oncerned with important rather than trivial matters").[8] A misrepresentation that is important is not necessarily the same as a misrepresentation that is dispositive of the question of whether an applicant would have been hired.

Moreover, the court of appeals' materiality standard requires a subjective analysis. But we have said that whether conduct clearly displays a "serious violation" of the standards of behavior an employer has the right to reasonably expect is an objective determination, not a subjective one. *Jenkins*, 721 N.W.2d at 290. In contrast to an objective determination, the materiality definition the court of appeals applied asks us to look at whether *this employer would have hired this applicant* if she had been truthful.

In sum, the materiality definition, as the court of appeals applied it here, is incompatible with the statute and our case law interpreting the statute. Because the statutory definition of "employment misconduct" is expressly exclusive and the common law materiality definition does not comport with the statutory definition, the court of appeals erred in applying the common law definition.[9]

---

8     The dissent defines "serious" as "weighty." This definition is consistent with our approach. For the reasons described below, Wilson's misrepresentations were "weighty" violations of the standard of behavior MRC had the right to reasonably expect.

9     The dissent states that previous cases discussing the materiality standard may be instructive when interpreting the current statutory definition of "employment misconduct."

12

In urging us to reach the opposite conclusion and adopt the common law materiality standard, Wilson and the dissent point to the provision in the unemployment insurance law stating that the statute is "remedial in nature and must be applied in favor of awarding unemployment benefits." Minn. Stat. § 268.031, subd. 2 (2016). This provision of the statute also states that "[i]n determining eligibility or ineligibility for benefits, any statutory provision that would preclude an applicant from receiving benefits must be narrowly construed." *Id.* This statutory construction directive, however, is not applicable if, as is the case here, the statute is unambiguous. *See Russello v. United States*, 464 U.S. 16, 29 (1983) (discussing RICO's statutory requirement that it "be liberally construed" only after determining the statute was ambiguous).

Our decision in *Krueger v. Zeman Construction Co.*, 781 N.W.2d 858, 862-64 (Minn. 2010), confirms this rule. At issue there was the provision in the Minnesota Human Rights Act directing that its provisions "shall be construed liberally." Minn. Stat. § 363A.04 (2016). In *Krueger*, we concluded that the statute's construction directive did not justify going beyond the unambiguous terms of the statute to adopt " 'a meaning not

---

But the dissent does not cite to any cases that apply materiality consistently with the exclusive statutory definition of "employment misconduct." It is important to note, however, that our decision does not exclude the use of the general concept of "materiality" as a factor in determining whether an employee's conduct was a "serious violation" of the standards of behavior that an employer could reasonably expect. The common meaning of "material," like "serious," is synonymous with important. *Merriam-Webster's Collegiate Dictionary*, *supra*, at 715 (defining "material" as "having real importance or great consequences"). A misrepresentation that constitutes a "serious violation" is often one that is important. This sense of "materiality" can also be examined as an objective matter in a way that would be consistent with the statute. The inquiry in that circumstance would be whether a reasonable employer would have found that the misrepresentation was an important violation of its reasonable standards of behavior.

13

intended by the legislature.' " 781 N.W.2d at 863 (quoting *Beck v. Groe*, 245 Minn. 28, 44, 70 N.W.2d 886, 897 (1955)); *see also STRIB IV v. Cty. of Hennepin*, 886 N.W.2d 821, 826 (Minn. 2016) (stating that a construction directive cannot be used to change a statute's reach in the face of unambiguous language). Finally, the Legislature itself has directed that when the words of a law in application to a situation are "free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Minn. Stat. § 645.16. The statutory definition of "employment misconduct" is not ambiguous and neither is the exclusivity provision. Accordingly, the construction directive on which Wilson and the dissent rely is inapplicable.[10]

## II.

Having determined that the statutory definition of "employment misconduct" controls, we turn now to the question of whether MRC terminated Wilson for "employment misconduct." The ULJ concluded that it did. In unemployment benefits cases, we review the ULJ's findings of fact " 'in the light most favorable to the decision' " and will not disturb those findings "as long as there is evidence in the record that reasonably tends to sustain them." *Stagg*, 796 N.W.2d at 315 (citing *Jenkins*, 721 N.W.2d at 289). The question of whether an employee engaged in conduct that disqualifies him or her from unemployment benefits is a mixed question of fact and law. *Id.* Whether a particular act constitutes disqualifying conduct is a question of law we review de novo. *Id.*

---

[10] Even though the dissent does not conclude that the statute is ambiguous, the dissent still applies the narrow construction directive. Our precedent, however, simply does not leave room for the dissent's application of the directive in this case.

14

The parties dispute whether Wilson's misrepresentations constituted "employment misconduct" under the statutory definition. Wilson argues that her misrepresentations were not a "serious violation" of the standards of behavior MRC had a right to reasonably expect.[11] DEED, on the other hand, contends that Wilson's misrepresentations were a serious violation because lies about education level are always important. We agree with DEED that Wilson's misrepresentations were a serious violation under the circumstances presented here.

Wilson's misrepresentations constituted "employment misconduct" under the statute only if they were "intentional, negligent, or indifferent conduct, on the job or off the job" that clearly demonstrated a "serious violation of the standards of behavior the employer has the right to reasonably expect of the employee." Minn. Stat. § 268.095, subd. 6(a)(1). The statute provides that the standard of proof for issues of fact is a preponderance of the evidence standard. Minn. Stat. § 268.031, subd. 1 (2016). The statute also states that an "applicant's entitlement to unemployment benefits must be determined

---

[11]    As an alternative to Wilson's argument that her GED misrepresentations should not disqualify her from receiving benefits, Wilson argues that MRC did not discharge her because of those misrepresentations. She maintains that MRC terminated her because of her medical condition, which required her to take a leave of absence. The dissent draws on the same theory. *Infra* at D-6, n.4. The ULJ rejected Wilson's contention. We will not overturn the ULJ's findings of fact as long as there is evidence in the record that reasonably supports them. *Stagg*, 796 N.W.2d at 315. Here, the record supports the ULJ's finding. Wilson was not discharged until she failed to respond to MRC's request to verify her GED. Further, MRC's president testified that Wilson was discharged because of her misrepresentations. The ULJ determined that the president's testimony was more credible than Wilson's because it was more detailed, specific, and followed a more logical chain of events. These facts are sufficient to support the ULJ's decision and the dissent does not contend otherwise.

15

based upon that information available without regard to a burden of proof" and that there is "no presumption of entitlement or nonentitlement to unemployment benefits."[12]  Minn. Stat. § 268.069, subd. 2 (2016).  We interpret the statute's terms according to their plain meaning.  *Shire*, 875 N.W.2d at 292.  As noted above, the common, everyday meaning of "serious" is "important."  *Merriam-Webster's Collegiate Dictionary*, *supra*, at 1170.

When she misrepresented her educational qualifications, Wilson seriously violated a standard of behavior that a reasonable employer has the right to expect.  Wilson's conduct

---

[12]     The court of appeals improperly relied on precedent that has been superseded by this statute in imposing a burden of proof in this case.  The court stated that "[t]he party opposing the provision of benefits has the burden of demonstrating that the misrepresentation was material."  *Wilson*, No. A15-0435, 2015 WL 9264038, at *2 (drawing on *Hansen*, 412 N.W.2d at 323).  *Hansen*, however, was decided a decade before the Legislature added the language to the statute stating that unemployment benefits determinations are to be made without regard to a burden of proof.  *See* Act of Apr. 27, 1999, ch. 107, § 40, 1999 Minn. Laws 378, 408.

Wilson does not dispute the language in the statute, but argues that there is an implied burden of production or "an expectation[] that the employer will submit evidence to support and establish its assertion that the employee was terminated for employment misconduct since a terminated employee is entitled to . . . benefits unless he or she was terminated for some form of employment misconduct."  This position is contrary to the plain language of the statute.  The statute imposes no burden on an employer to submit evidence to show that it terminated an employee for misconduct.  Only the applicant is required to produce information for unemployment benefits determinations.  Minn. Stat. § 268.101, subd. 1(d) (2016) ("If the reason given by the applicant for no longer working for an employer is other than layoff because of lack of work, that raises an issue of ineligibility and the applicant is required . . . to state all the facts about the cause for no longer working for the employer, if known.").  An initial determination of ineligibility for unemployment benefits can be made even if the employer has not raised the issue of ineligibility. *Id.*, subd. 2(a) (2016).  Similarly, only the appealing party is a necessary party to a hearing by a ULJ.  Minn. Stat. § 268.105, subd. 1a(b) (2016) (stating that if an appealing party fails to participate in the hearing, the ULJ may dismiss the appeal by summary decision).  Nothing in the statute requires the employer to produce information or participate in the process.

was "intentional," Minn. Stat. § 268.095, subd. 6(a). The job application requested information about Wilson's education, including information about her high school education, and Wilson did not respond truthfully. The ULJ, based on the evidence he received and his credibility determinations, found that Wilson falsified her education level in two respects—the highest grade she completed and the receipt of a GED. The ULJ found that Wilson knew these two statements were false and that she "intentionally falsified her education level." Sufficient evidence in the record supports these findings.

The intentional violation was also serious. The application requested that Wilson circle the "highest grade" she completed and Wilson circled "12," when in reality she had completed only 11th grade. In addition, instead of identifying the high school from which she graduated as requested on the form, Wilson stated that she received a GED from "MN Educational Center" in Minneapolis. With these two statements, Wilson misrepresented the education level she had completed. It is not as if Wilson misspelled the name of the high school she attended. Rather, through these two statements, she portrayed herself as having received the benefit of a high school education when in reality she had not completed high school. Our society has always valued education. *See Kaplan v. Indep. Sch. Dist. of Virginia*, 171 Minn. 142, 143, 214 N.W. 18, 18 (1927) ("This state has from the beginning . . . deem[ed] the education of its citizens essential to their own happiness and welfare, to the peace and prosperity of the nation, and to an intelligent participation in the government of a republic and a proper exercise of the right of suffrage."). Because of the importance we place on education, we agree with DEED that Wilson's

17

misrepresentations about the educational level she achieved are serious under these circumstances.[13]

Finally, Minnesota employers have the right to reasonably expect that applicants will tell the truth during the employment process.[14] The court of appeals agreed, noting that "[e]mployers are reasonably entitled to expect honesty from their employees." *Wilson*, No. A15-0435, 2015 WL 9264038, at *2. Wilson similarly states "it is generally understood that job applicants are reasonably expected to provide prospective employers with accurate information and to fill out job applications in a truthful manner." The fact that MRC included language on its application form stating its policy of discharging employees based on false application information further confirms this expectation.

---

[13] At the same time, we agree with the court of appeals that adopting a bright-line rule that any misrepresentation on a job application is employment misconduct would not be appropriate. Unemployment compensation determinations are inherently fact-based inquiries. *See Jenkins*, 721 N.W.2d at 290 (declining to adopt a rule that absenteeism resulting from incarceration was misconduct as a matter of law and instead required DEED to base determinations on " 'the facts in each particular case' " (quoting *Grushus v. Minn. Mining & Mfg. Co.*, 257 Minn. 171, 176, 100 N.W.2d 516, 520 (1960))). Whether misrepresentations on an employment application are employment misconduct depend on the circumstances of each case.

[14] The dissent cites *Jenkins*, arguing, in effect, that if an employee who was absent from work because she was incarcerated is entitled to unemployment benefits, then surely Wilson should similarly be entitled to benefits. In *Jenkins*, we held that the employee did not violate the employer's reasonable expectations because she made diligent efforts to report to work despite her incarceration. 721 N.W.2d at 291-92. The employee was absent because her employer failed to verify her employment. *Id.* Accordingly, the employer's expectation that the employee be at work was not reasonable, given the circumstances. Here, however, there is no dispute that MRC's expectation that its employees tell the truth on employment applications was reasonable. Accordingly, *Jenkins* does not support the dissent's conclusion that Wilson is entitled to receive unemployment benefits.

18

In urging us to conclude that she was not terminated for employment misconduct, Wilson and the dissent rely on Minnesota Statutes § 268.095, subd. 6(d), and argue that Wilson's misrepresentations constituted only a single incident. This part of the statute provides that if the conduct for which the employee was discharged was only a single incident, "that is an important fact that must be considered in deciding whether the conduct rises to the level of employment misconduct." We do not consider Wilson's behavior to constitute a single incident. On the application, Wilson misrepresented both the highest grade that she had attained as well as the manner in which she received her high school education. After her employment started, Wilson had the opportunity to correct her misstatements, but she did not do so. Based on the record in this case, we do not view Wilson's misrepresentations about her educational background to be a single incident.[15] But even if we were to view Wilson's misrepresentations on the employment application as a single incident under the statute, this would not alter our conclusion that Wilson's misrepresentations to her employer that she had received the benefit of a high school education is a serious violation. *See Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 806 (Minn. 2002) (noting that a single incident can constitute employment misconduct).

---

[15] The ULJ similarly found that Wilson was discharged because of MRC's concern about "her false statements." There is sufficient evidence in the record to support this finding.

Based on our analysis of the facts and circumstances of this case, we hold that Wilson was terminated for "employment misconduct," as defined in Minn. Stat. § 268.095, subd. 6(a)(1).[16]  Accordingly, Wilson is not eligible for unemployment benefits.

Reversed.

---

[16] In reaching a different conclusion, the dissent engages in fact-finding, concluding that Wilson's misstatements about her education did not bear on her ability to do her job. *Infra* at D-5.  Specifically, the dissent states that "the record shows that Wilson's position did not involve confidential or sensitive information or the handling of money or valuable property." *Id.*  The dissent also asserts that "[t]he requirements of [Wilson's] position did not demand heightened levels of trustworthiness." *Id.*  But the ULJ did not make any such findings and our scope of review does not include appellate fact-finding. *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 795 n.2 (Minn. 2013).  The dissent also looks to *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340 (Minn. App. 2006), to distinguish this case from cases in which the court of appeals has found a single incident to constitute misconduct.  But the single-incident statutory provision on which *Skarhus* relied was substantively different:  the statute exempted from the statutory definition of employment misconduct "a single incident that does not have a significant adverse impact on the employer."  Minn. Stat. § 268.095, subd. 4(1) (2004).  This version of the statute is materially different from the current statutory framework, which states that whether misconduct is a single incident is an "important fact" that may be considered.  Minn. Stat. § 268.095, subd. 6(d).  Accordingly, *Skarhus* is of no help to our analysis.

CHUTICH, Justice (dissenting).

I respectfully dissent from the majority's legal conclusion that Nina Wilson committed employment misconduct. Given the remedial nature of the unemployment-compensation statutes, along with the particular circumstances of this employment-application case, Wilson's single misstatement about her educational level—especially when the misstatement did *not* satisfy the position description's required minimum educational level of a "2 or 4 year undergraduate degree"—was not employment misconduct that disqualified her from receiving benefits.

As a threshold matter, I agree with the majority that the statutory definition of employment misconduct is exclusive and must be applied here.[1] The statute specifically defines "employment misconduct" as "any intentional, negligent, or indifferent conduct, on the job or off the job that *displays clearly*: (1) a *serious violation* of the standards of behavior the employer has the right to reasonably expect of the employee." Minn. Stat. § 268.095, subd. 6(a)(1) (2016) (emphasis added).[2] Whether an employee "was properly

---

[1] I also agree that unemployment benefits are to be "determined based upon that information available without regard to a burden of proof." Minn. Stat. § 268.069, subd. 2 (2016). Although the hearing participants do not carry a burden of proof or of production, the Minnesota Rules make clear that an unemployment law judge "must ensure that all relevant facts are clearly and fully developed." Minn. R. 3310.2921 (2015); *see also id.* ("The hearing must be conducted by an unemployment law judge as an evidence-gathering inquiry, without regard to a burden of proof.") Because many applicants are not represented by counsel, this duty is critical.

[2] Like the majority, my analysis is limited to this first definition of "employment misconduct" and does not consider subdivision 6(a)(2). *See* Minn. Stat. § 268.095, subd. 6(a).

disqualified from receipt of unemployment compensation benefits is a question of law on which we are free to exercise our independent judgment." *Jenkins v. Am. Exp. Fin. Corp.*, 721 N.W.2d 286, 289 (Minn. 2006).

In determining whether Wilson's conduct clearly displayed a "serious violation," we note that the adjective "serious" has common and approved meanings that range from "non-trivial" to "important" to "weighty." *See Merriam-Webster's Collegiate Dictionary* 1066 (10th ed. 2001) (defining "serious" as "of or relating to a matter of importance" or "weighty"); *The American Heritage Dictionary* 1648 (3d ed. 1996) (defining "serious" as "[c]oncerned with important rather than trivial matters"). In choosing among the range of these established meanings of "serious," the statute itself gives us guidance.

We have repeatedly recognized the Legislature's directive that the statute is "remedial in nature and must be applied in favor of awarding unemployment benefits." Minn. Stat. § 268.031, subd. 2 (2016); *see, e.g.*, *Jenkins*, 721 N.W.2d at 289. In particular, the Legislature specifically directed that, "[i]n determining eligibility or ineligibility for benefits, any statutory provision that would preclude an applicant from receiving benefits must be narrowly construed." Minn. Stat. § 268.031, subd. 2. Accordingly, construing "serious" narrowly in the context of unemployment-benefit laws, as the Legislature instructs us to do, a "serious violation" must be one of "much importance or consequence."[3] *See Merriam-Webster's Collegiate Dictionary*, *supra,* at 1336 (defining "weighty").

---

[3] The majority dismisses these statutory provisions by asserting that the statutory definition of misconduct is not ambiguous. To be sure, a statute's construction directive does not justify going beyond the terms of the statute to adopt "a meaning not intended by the legislature." *Krueger v. Zeman Constr. Co.*, 781 N.W.2d 858, 863 (Minn. 2010)

In construing whether a "serious violation" occurred here, the concept of materiality is relevant. The Department of Employment and Economic Development (the department) and the majority recognize as much: the department agrees in its brief that "prior case law is a guide to the 'standards of behavior' and 'reasonable expectations' an employer can require," and the majority recognizes "the general concept of 'materiality' as a factor in determining whether an employee's conduct was a 'serious violation' of the standards of behavior that an employer could reasonably expect." Thus, although past cases discussing materiality in the context of an employment application are not dispositive, they still may be instructive when interpreting and applying the current exclusive statutory definition of "employment misconduct."

Critically, in determining whether an employee's behavior is a "serious violation" of the standards of behavior an employer has a right to expect, our past cases make clear that the circumstances of each case are key. *Stagg v. Vintage Place, Inc.*, 796 N.W.2d 312, 316 (Minn. 2011) ("Whether an employee's absenteeism and tardiness amount[] to a serious violation of the standards of behavior an employer has a right to expect *depends on the circumstances of each case*." (emphasis added)); *Jenkins*, 721 N.W.2d at 290. In

---

(citation omitted) (internal quotation marks omitted). But here, where the statute contains not just a general statement that it shall be "construed liberally," but also a specific provision *requiring* ("must") a narrow construction of those provisions that would bar an applicant from receiving benefits, the court should honor "the letter of the law" in interpreting the meaning of the term "serious." *See* Minn. Stat. § 645.16 (2016); *Krueger*, 781 N.W.2d at 861 ("We 'construe words and phrases . . . according to their most natural and obvious usage unless it would be inconsistent with the manifest intent of the legislature.'" (quoting *ILHC of Eagan, LLC v. Cty. of Dakota*, 693 N.W.2d 412, 419 (Minn. 2005))); *see also Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949) ("Statutory definitions control the meaning of statutory words.").

*Jenkins*, for example, we emphasized the importance of making a case-by-case determination and we rejected applying a rigid rule of per se misconduct. We noted that we "declined to adopt a rule that absenteeism resulting from incarceration was misconduct as a matter of law." *Jenkins*, 721 N.W.2d at 290. Rather, we directed the department to "base its determinations 'upon the facts in each particular case.'" *Id.* (quoting *Grushus v. Minn. Mining & Mfg. Co.*, 257 Minn. 171, 176, 100 N.W.2d 516, 520 (1960)).

Here, the department urges the court to depart from this well-established principle by adopting a per se rule for dishonesty about one's educational level. When an employee's actual incarceration and subsequent absences do not give rise to a per se rule of employee misconduct, *see id.*, a misstatement on an employment application surely cannot rise to misconduct as a matter of law. Such a broad-brush treatment of an applicant's intentional—or even negligent—misrepresentation concerning her level of education runs afoul of the specific legislative directive that "any statutory provision that would preclude an applicant from receiving benefits must be narrowly construed." Minn. Stat. § 268.031, subd. 2. Accordingly, adopting a bright-line rule treating any and all misrepresentations of educational level as employment misconduct is unwarranted.

Applying these principles here, the facts and circumstances of this particular case show that Wilson's misstatement, in the context of this hiring decision and course of employment, did not rise to the level of employment misconduct. First, the employment application shows that Mortgage Resource Center, Inc. (MRC) provided two routes by which prospective employees could enter the company: demonstrating a "2 or 4 year undergraduate degree or equivalent experience." In terms of experience, MRC required

"[a]t least 5 years of account management or customer service experience." The record shows that Wilson obtained her position based on "equivalent experience" because a GED did not meet the job's minimum educational requirement. The record further shows that Wilson more than met the experience avenue to employment—she had more than 20 years of experience in customer service. Wilson's actual work experience demonstrates that she had the ability to perform the particular position even without the requisite college degree. Her misstatement about her education did not bear on her ability to do the job, which is an important consideration in weighing whether the misstatement was a "serious violation" under Minnesota's unemployment-compensation laws.

Second, the record shows that Wilson did not try to deceive MRC into believing that she had the educational qualifications that the employer *required* for the position. The position statement specifying education required a "2 or 4 year undergraduate degree," which is, at a minimum, two years of education and a college degree beyond the GED that Wilson inaccurately listed. Accordingly, Wilson's prospective employer knew that Wilson did not have the educational level that it sought and that she did not qualify for the job based solely on her education. Given her insufficient educational level, her misstatement did not prevent her future employer from questioning her ability to perform the particular job, making the misstatement less serious than those statements that attest to the position's *required* qualifications.

Third, the nature of Wilson's position provides further support that the misstatement was not a serious violation. Although the unemployment law judge credited MRC's

position that the misstatement "compromised MRC's trust" in her,[4] the record shows that Wilson's position did not involve confidential or sensitive information or the handling of money or valuable property. The requirements of her position did not demand heightened levels of trustworthiness. This fact distinguishes her case from those instances in which a single incident of misconduct related directly to the employee's job duties. *See, e.g.*, *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006) (concluding that theft of food involving a minimal dollar value was employment misconduct because the employer could no longer trust the employee to handle money and accounts for sales, an essential part of a cashier's position).[5]

---

[4] In fact, the unemployment law judge concluded only that MRC discharged Wilson "in large part" because of the discrepancy in her educational background. Whether that statement of causation satisfies the statute has not been challenged. But the facts in the record suggest another theory: that MRC, which was being acquired by another company, seized on the educational discrepancy to terminate the employment of Wilson, who was on a temporary leave of absence because of medical issues.

The record shows that MRC received Wilson's background report on June 17, 2014, about one week before she *began* work. MRC did not inquire about the discrepancy, however, until September 10, 2014. Its inquiry came only after MRC had received Wilson's request for an indefinite leave of absence, MRC had warned her that it could not keep her position open while she was gone, and MRC had terminated her healthcare coverage. In addition, Wilson had applied for unemployment benefits in early September. As the President of MRC testified, "[W]e had two issues going on. We chose to terminate Mrs. Wilson as a result of her misstatements on her application. Ultimately, had she not returned to work we would have replaced her with another employee."

[5] *Skarhus* was decided under an earlier version of the "single incident" provision of the unemployment compensation law, Minn. Stat. § 268.095, subd. 4(1) (2004), but it continues to show that any alleged dishonesty must be evaluated in light of the circumstances of each case, *Skarhus*, 721 N.W.2d at 344.

Fourth, in weighing whether, under the circumstances present here, Wilson's misstatement rises to the level of employment misconduct, the statute itself instructs us to consider whether Wilson was discharged for only a single incident. Minn. Stat. § 268.095, subd. 6(d) (2016) ("If the conduct for which the applicant was discharged involved only a single incident, that is an important fact that must be considered in deciding whether the conduct rises to the level of employment misconduct."). The majority's conclusion that Wilson's misstatement about having received a GED should be considered to be three incidents is overreaching. MRC's position and the unemployment law judge's decision finding that "Wilson intentionally falsified her education level" show that the termination occurred "in large part" because Wilson's application stated that she had a GED, when she did not.[6]

Of course, I do not condone any misstatements on an employment application, whether intentional or negligent. But although a misrepresentation may warrant discharging an employee, it is not inevitably employment misconduct. *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 806 (Minn. 2002) ("[T]he issue is not whether the

---

[6]    In listing her education, Wilson circled twelfth grade as the highest grade completed. Since a GED is a high school equivalency test, this assertion is part and parcel of listing a GED as a degree. In addition, the assertion that Wilson committed another act of misconduct when she did not provide a copy of her GED when requested in September is unavailing. The company specifically stated in the letter that if it did not receive the GED information in a week, it "will proceed under the assumption that the representation in your application was not accurate." As the unemployment law judge found, Wilson did not have a GED; her lack of response was thus understandable, especially considering that Wilson was on a leave of absence for ill health and that the company had informed her on August 20, 2014, that it needed to "immediately begin the process of hiring someone else to perform [her] position."

employer can choose to terminate the employment relationship, but rather 'whether now that the employee has been terminated, there should be unemployment compensation . . . .' " (citation omitted)). Here, applying the exclusive statutory definition to the facts and context of this particular case, Wilson's single misstatement did not clearly display a serious violation, and thus did not rise to the level of employment misconduct. I would affirm the decision of the court of appeals, which holds that Wilson is eligible to receive unemployment benefits.

LILLEHAUG, Justice (dissenting).

I join in the dissent of Justice Chutich.

HUDSON, Justice (dissenting).

I join in the dissent of Justice Chutich.