*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1538**

Peggy Adegeye,
Respondent,

vs.

BB Home Healthcare,
Relator,

Department of Employment and Economic Development,
Respondent.

**Filed June 24, 2024
Reversed
Johnson, Judge**

Department of Employment and Economic Development
File No. 49660329-3

Peggy Adegeye, Brooklyn Park, Minnesota (*pro se* respondent)

Alicia L. Anderson, Law Office of Alicia L. Anderson, Edina, Minnesota (for relator)

Keri A. Phillips, Minnesota Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Ross, Presiding Judge; Johnson, Judge; and Reyes, Judge.

**NONPRECEDENTIAL OPINION**

**JOHNSON**, Judge

The issue in this appeal concerning unemployment benefits is whether a person who worked as a personal care assistant did so as an employee or as an independent contractor.

We conclude that the person was an independent contractor. Therefore, we reverse the decision of the unemployment-law judge.

**FACTS**

Barbara Burns is a personal-care assistant (PCA) and the owner and proprietor of BB Home Health Care, LLC (BBHH). In 2020, Burns was asked to assemble a team of PCAs who could provide around-the-clock care for S.C., who has dementia and lives in a nursing home. Burns agreed to do so, and BBHH entered into a contract with S.C.'s family for such services.

In general, when a new PCA begins work for a BBHH client, Burns or another person introduces the PCA to the client and the client's family and shows the new PCA around the client's home. Burns does not provide training to PCAs when they begin caring for one of BBHH's clients. Burns does not supervise or oversee the PCAs who work for BBHH. Burns typically stops by her clients' homes "once in a while" to stay in contact with the client and the client's family and to ensure that PCAs are adhering to certain requirements of state licensing agencies.

The agency record in this case shows that BBHH typically used three or four PCAs to provide around-the-clock care for S.C. Burns told the PCAs to "care for [S.C. as if] she is your mother or your grandmother." On any given day, the PCAs independently make decisions about how to care for S.C. and what her activities should be. The PCAs do not cook for S.C. or give her prescribed medications; those functions are performed by the nursing home where she resides.

On a monthly basis, the PCAs caring for S.C. agree among themselves on a schedule and provide it to Burns. Burns does not impose any rules or parameters on the PCAs when they are making schedules except that they collectively should ensure around-the-clock care of S.C. and individually should not work more than 24 consecutive hours. If there is a gap in coverage, whether planned or unexpected, the PCAs inform Burns, who works the open shift herself to ensure constant coverage.

BBHH pays the PCAs an hourly rate for their work. Burns personally hand-writes checks to each PCA on a bi-weekly basis based on the number of hours worked by the PCA during the prior two-week period. BBHH issues 1099 forms (not W-2 forms) to its PCAs on an annual basis.

In July 2022, Peggy Adegeye began providing care for S.C. through BBHH. Adegeye was an experienced PCA who had provided care for other persons in the past. She found work with BBHH through a friend who was one of the existing PCAs providing care for S.C. Burns and Adegeye signed a four-page contract entitled "Independent Contractor Agreement." On Adegeye's first day of providing care for S.C., Burns introduced her to S.C., but the PCA who is Adegeye's friend showed Adegeye around S.C.'s home and told her about S.C.'s and her family's preferences. Throughout the three-month period in which Adegeye cared for S.C., BBHH's only client was S.C. Adegeye was free to work as a PCA for other clients.

Adegeye ceased work as a PCA for BBHH in November 2022 for reasons that are in dispute but not relevant to this appeal. In March 2023, Adegeye applied to the department of employment and economic development for unemployment benefits. In

3

June 2023, the department made two initial determinations: that Adegeye was an employee of BBHH and that she is eligible for benefits. BBHH filed an administrative appeal of the initial determinations. In July 2023, an unemployment-law judge (ULJ) conducted an evidentiary hearing. Burns appeared on behalf of BBHH and testified; Adegeye appeared on her own behalf and also testified. Later that month, the ULJ issued a written decision determining, with respect to the first issue, that Adegeye was an employee of BBHH. BBHH requested reconsideration. The ULJ affirmed the decision in a written order that was issued in September 2023. BBHH appeals by way of a writ of certiorari. This appeal is confined to the first issue decided by the ULJ.

**DECISION**

BBHH argues that the ULJ erred by concluding that Adegeye was an employee of BBHH rather than an independent contractor.

Adegeye may receive unemployment benefits only if she was an employee of BBHH; she may not receive unemployment benefits if she was an independent contractor. This is so because the department must pay unemployment benefits to an applicant only if the applicant meets five statutory requirements. Minn. Stat. § 268.069, subd. 1 (2022). The first requirement is that the applicant has filed an application for unemployment benefits and established a benefit account. *Id.*, subd. 1(1); *see also* Minn. Stat. § 268.07 (2022 & Supp. 2023). To establish a benefit account, an applicant must have earned a minimum amount of "wage credits" during the relevant period of time. Minn. Stat. § 268.07, subd. 2(a) (2022); *Samuelson v. Prudential Real Estate*, 696 N.W.2d 830, 832 (Minn. App. 2005). "Wage credits" are defined as "the amount of wages paid within an

4

applicant's base period for covered *employment*." Minn. Stat. § 268.035, subd. 27 (2022) (emphasis added). A person performs services in employment if the person "is an employee under the common law of employer-employee and not an independent contractor." *Id.*, subd. 15(a)(1). For purposes of unemployment benefits, an applicant is an "employee" if the applicant "is performing or has performed services for an employer in employment." *Id.*, subd. 13(1).

Whether a person performed services as an employee or an independent contractor depends on a five-factor balancing test. *St. Croix Sensory, Inc. v. Department of Emp't & Econ. Development*, 785 N.W.2d 796, 800 (Minn. App. 2010) (citing *Guhlke v. Roberts Truck Lines*, 128 N.W.2d 324, 326 (Minn. 1964)); Minn. R. 3315.0555, subp. 1 (2021). Both BBHH and the department cite the five factors as they are set forth in the department's administrative rules, which are:

> A. the right or the lack of the right to control the means and manner of performance;
>
> B. the right to discharge the worker without incurring liability for damages;
>
> C. the mode of payment;
>
> D. furnishing of materials and tools; and
>
> E. control over the premises where the services are performed.

Minn. R. 3315.0555, subp. 1. The most important factors are the first and the second. *Id.*

In general, when this court reviews a decision of a ULJ, we review factual findings "in the light most favorable to the decision," and we "will not disturb those findings as long

5

as there is evidence in the record that reasonably tends to sustain them." *Wilson v. Mortgage Resource Ctr., Inc.*, 888 N.W.2d 452, 460 (Minn. 2016) (quotation omitted). However, "[w]hether an individual is an employee or an independent contractor is a mixed question of law and fact." *St. Croix Sensory*, 785 N.W.2d at 799. Consequently, if the relevant facts are undisputed, this court applies a *de novo* standard of review to the question whether a person was an employee or an independent contractor. *Id.*

The ULJ stated generally that Adegeye's testimony was more credible than Burns's testimony. But the ULJ did not identify any purely factual issue for which Burns and Adegeye provided conflicting testimony. At oral argument, we asked counsel to identify the disputed factual issues. It appears that there are no material factual differences between the testimony of Burns and the testimony of Adegeye. Accordingly, we apply a *de novo* standard of review to the ULJ's decision. *See id.*

The ULJ determined that four factors (the first, second, third, and fifth) indicate that Adegeye was an employee and that one factor (the fourth) is "neutral." On appeal, BBHH challenges the ULJ's determinations with respect to the first, third, and fifth factors and challenges the ULJ's overall conclusion that Adegeye was an employee of BBHH.

**A.     Control of Means and Manner of Performance**

The ULJ determined that this factor indicates that Adegeye was an employee. The ULJ reasoned that BBHH expected Adegeye to treat S.C. like she would treat her own mother or grandmother, to abide by S.C.'s preferences, to use a checklist, and to maintain a daily journal.

6

BBHH argues that the ULJ erred because BBHH merely identified general tasks but did not tell Adegeye how to accomplish those tasks and because the checklist and journal were required by state regulations.

"The right of control is the most important factor for determining whether a worker is an employee." *St. Croix Sensory*, 785 N.W.2d at 800. "The determinative right of control is not merely over *what* is to be done, but primarily over *how* it is to be done." *Neve v. Austin Daily Herald*, 552 N.W.2d 45, 48 (Minn. App. 1996) (quoting *Frankle v. Twedt*, 47 N.W.2d 482, 487 (Minn. 1951)).

The evidence shows that BBHH did not control *how* Adegeye performed the work of a PCA. The general directive to treat S.C. as one would treat a mother or grandmother indicates a low degree of control. This evidence is analogous to the evidence in *St. Croix Sensory*, in which there was a lack of detailed instructions but, rather, an expectation that workers would rely on their own judgment. 785 N.W.2d at 802. In addition, BBHH introduced evidence that state regulations require PCAs to use a checklist of tasks and to maintain a daily journal. This court has stated that "instructions required by laws or regulations or general instructions passed on by the employer from a client generally do not evince control." *Id.* Furthermore, the department's oral argument causes us to believe that the checklist (which is not in the record) guided Adegeye far more in terms of *what* to do than *how* to do the listed tasks. In short, the evidence on which the ULJ relied does not show that BBHH exercised control over how Adegeye cared for S.C.

A lack of control also is shown by the abbreviated orientation that Adegeye received and the lack of supervision or oversight by Burns. Another PCA—the friend of Adegeye

7

who connected her to BBHH—showed Adegeye around S.C.'s residence at the nursing home. Burns rarely was present at S.C.'s residence when Adegeye provided services.

In addition, BBHH's lack of control is indicated by the fact that Burns did not tell Adegeye when to work. Indeed, Burns usually was completely uninvolved in the task of scheduling. Adegeye was free to sign up for more shifts, fewer shifts, or no shifts, so long as the team of PCAs found a way to provide around-the-clock care for S.C. Adegeye was required to work only the shifts that she had agreed to work. *See Boily v. Commissioner of Econ. Sec'y*, 544 N.W.2d 295, 296 (Minn. 1996) (reasoning, in part, that workers were independent contractors because they "set their own schedules").

Thus, the first factor indicates that Adegeye was an independent contractor.

**B. Discharge Without Liability**

The ULJ determined that this factor indicates that Adegeye was an employee. BBHH concedes the point. For purposes of this nonprecedential opinion, we accept BBHH's concession and conclude that the second factor indicates that Adegeye was an employee of BBHH.

**C. Mode of Payment**

The ULJ determined that this factor indicates that Adegeye was an employee. The ULJ reasoned simply that Adegeye "was paid by the hour and received biweekly paychecks."

BBHH argues that being paid by the hour does not necessarily indicate an employer-employee relationship if hourly pay is the most equitable means of compensating workers. BBHH cites *Don Robinson Motors, Inc. v. Department of Emp't & Econ. Development*,

8

No. A13-0327, 2013 WL 6569923 (Minn. App. Dec. 16, 2013), in which we concluded that the workers were independent contractors despite being paid by the hour. *Id.* at *3; *see also* Minn. R. Civ. App. P. 136.01, subd. 1(c) (providing that nonprecedential opinions are "not binding authority" but "may be cited as persuasive authority"). In addition, the supreme court concluded in *Boily* that workers were independent contractors despite receiving regular monthly payments that were not "a fixed salary." *See* 544 N.W.2d at 296-97.

In this case, BBHH did not use a computerized payroll system to compensate its PCAs in fixed amounts with direct deposits to their bank accounts. Instead, Burns hand-wrote checks to PCAs in amounts that depended on the amounts of time they worked during the relevant pay periods. That mode of payment is not the mode of payment typically used with employees. Furthermore, BBHH did not withhold payroll and income taxes, which meant that Adegeye was responsible for her own tax obligations. "Evidence that an individual is responsible for his or her own tax obligations is indicative of independent-contractor status." *St. Croix Sensory*, 785 N.W.2d at 804.

Thus, the third factor indicates that Adegeye was an independent contractor.

## D. Furnishing of Material and Tools

The ULJ determined that this factor is neutral. BBHH does not challenge that determination. For purposes of this nonprecedential opinion, we conclude that the fourth factor does not indicate either an employer-employee relationship or an independent-contractor relationship.

9

**E.      Premises Where Services are Performed**

The ULJ determined that this factor indicates that Adegeye was an employee.  The ULJ reasoned that Adegeye performed her job duties at a nursing home.

BBHH argues that the ULJ erred because BBHH had no control over the premises where Adegeye performed her duties.  In response, the department argues that (contrary to the ULJ's decision) this factor is neutral in light of "the context of the industry involved."

BBHH's argument is supported by caselaw indicating that, if a worker performs services at a location that is not controlled by the alleged employer, the worker usually is an independent contractor.  *See Holzemer v. Minnesota Milk Co.*, 259 N.W.2d 592, 593-94 (Minn. 1977) (affirming finding of workers'-compensation court that driver who delivered goods to customers' homes was independent contractor); *Neve*, 552 N.W.2d at 47-49 (reversing ULJ's decision by concluding that worker who delivered newspapers by vehicle in rural area was independent contractor); *Carey v. Coty Constr.*, 392 N.W.2d 746, 749 (Minn. App. 1986) (affirming ULJ's decision that claimant was independent contractor based in part on evidence that he worked at job sites belonging to third parties); *Ride Auto Co. v. Department of Emp't & Econ. Development*, No. A13-0134, 2013 WL 6152181, at *5 (Minn. App. Nov. 25, 2013) (reversing ULJ's decision by concluding that workers were independent contractors, in part because they "work offsite"); *Benco Delivery Service Inc. v. Department of Emp't & Econ. Development*, No. A09-942, 2010 WL 1657294, at *2 (Minn. App. Apr. 27, 2010) (reversing ULJ's decision by concluding that workers were independent contractors, in part because their work "does not occur on Benco premises"); *see also* Minn. R. Civ. App. P. 136.01, subd. 1(c).  This body of caselaw shows that, if a

worker performs services at a third party's site, the alleged employer does *not* have control of the premises, which implies an independent-contractor relationship, not an employer-employee relationship. In other words, if *both* the worker and the alleged employer lack control over the worker's worksite, the fifth factor is not "neutral" but, rather, is indicative of an independent-contractor status.

Thus, the fifth factor indicates that Adegeye was an independent contractor.

## F.     Summary

In sum, three factors (the first, third, and fifth) indicate that Adegeye was an independent contractor. One factor (the second) indicates that Adegeye was an employee of BBHH. The parties agree that one factor (the fourth) does not indicate either an employer-employee relationship or an independent-contractor relationship. The fact that more factors indicate an independent-contractor relationship supports the conclusion that Adegeye was an independent contractor.

The conclusion that Adegeye was an independent contractor is consistent with the nature of the contractual relationship between BBHH and S.C.'s family and the nature of the working relationship between BBHH and the PCAs who cared for S.C. In essence, S.C.'s family hired BBHH to find competent and responsible PCAs who could provide around-the-clock care for S.C. In Burns's testimony, she described BBHH as "a placement agency." The evidence shows that BBHH placed Adegeye with S.C. and that, thereafter, Adegeye worked independently to provide services to S.C. and her family without meaningful control by BBHH.

11

Therefore, we conclude that Adegeye was an independent contractor.

**Reversed.**