*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A24-0130**

Adelaja A. Adenuga,
Relator,

vs.

Methodist Hospital,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed September 30, 2024**
**Affirmed**
**Halbrooks, Judge**[*]

Department of Employment and Economic Development
File No. 49987696-3

Adelaja A. Adenuga, Brooklyn Park, Minnesota (pro se relator)

Methodist Hospital, St. Louis Park, Minnesota (respondent employer)

Keri A. Phillips, Katrina Gulstad, Minnesota Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

        Considered and decided by Reyes, Presiding Judge; Slieter, Judge; and Halbrooks, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**HALBROOKS**, Judge

Relator challenges the decision of an unemployment-law judge (ULJ) that he is ineligible for unemployment benefits because he was discharged for misconduct, arguing that the determination is not supported by the evidence. We affirm.

## FACTS

Relator Adelaja A. Adenuga was employed by respondent Methodist Hospital (hospital) as a lab assistant from February 6 through September 13, 2023. In April or May 2023, Adenuga began making comments to coworker 1 about her being in a relationship with another employee, which coworker 1 refuted and reported made her uncomfortable. Adenuga continued making the comments despite coworker 1 asking him to stop. Near the end of May, coworker 1 emailed the lab supervisor to report that Adenuga was sexually harassing her. Coworker 1 also reported that, on one occasion when she tried to walk away from Adenuga, he grabbed her wrist and said that he "was not done talking," and on another occasion coworker 1 overheard Adenuga say that he "did not like working with Somali women because they smelled," and "he didn't like their attitudes."

Adenuga's supervisor gave him a verbal warning in June, which was subsequently documented in writing. The warning stated that Adenuga was required to "act in a professional and respectful manner," and instructed him to "read and understand the Harassment, Offensive and Disruptive Behavior Policy." The policy stated that there were multiple forms of inappropriate behavior, including words, jokes, physical contact,

intimidation, or behavior intended to demean or belittle someone else. Adenuga signed the warning.

In August 2023, less than two months after receiving the first warning, a supervisor was informed that coworker 2 told Adenuga he had bad customer-service skills and that Adenuga responded that coworker 2 did not "have enough education to tell [him] about patient care." In response to an email from his supervisor about this, Adenuga stated, "When I'm pushed to the wall, I give a good payback measure of what I received." A few days later, an "escalated event" took place in the phlebotomy room between Adenuga and coworker 2.

Coworker 2 told the supervisor that she was in the phlebotomy room on a different day when Adenuga bumped her with his cart. After she said, "Don't you see me, I'm here," Adenuga continued to push the cart into her. Coworker 2 told the supervisor that she "felt like she was physically harmed, she felt unsafe and said that . . . [Adenuga] could not treat her that way, that she would call safety and security." When asked about the incident, Adenuga told the supervisor that he did not recall bumping into coworker 2 and that she had blocked him from entering the phlebotomy room. Adenuga was given a written warning. He reviewed and signed a document acknowledging this and was moved from the night shift to a day shift in order to avoid contact with coworker 2.

A few days after receiving the second warning, while on his new shift assignment, Adenuga told coworker 3, who was eating a cookie in the break room, that she was fat because she ate sugar. Coworker 3 reported to the lab supervisor that Adenuga's comment "made her feel uncomfortable" and "saddened that he had said that to [her]." The record

demonstrated that coworker 3 "tried to laugh it off, not knowing what to do in that moment." Coworker 4 witnessed the exchange and, in a separate interview, reported the event consistently with coworker 3's account. The lab manager met with Adenuga to try to understand his side of the story, but Adenuga stated that he did not recall the situation. Adenuga was discharged from employment on September 13, 2023, for repeated violations of the hospital's policy.

Adenuga applied for unemployment benefits and was initially deemed eligible for benefits by respondent Minnesota Department of Employment and Economic Development. The hospital appealed. At an evidentiary hearing before the ULJ, the lab supervisor testified concerning coworker 1's reports about the interpersonal issues between Adenuga and coworker 1, the incident with coworker 2, and the email that Adenuga sent the lab supervisor addressing Adenuga's reaction to coworker 2. The lab manager testified about the reports from coworker 3 and coworker 4. The ULJ determined that Adenuga was discharged for employment misconduct and is, therefore, ineligible to receive unemployment benefits.

Adenuga sought reconsideration. The ULJ affirmed the decision of ineligibility upon reconsideration but modified the written decision to correct a typographical error in the quote of Adenuga's statement to coworker 3.

This certiorari appeal by Adenuga follows.

## DECISION

When reviewing the ULJ's eligibility determination, we may affirm, remand for further proceedings, or reverse or modify the decision if the substantial rights of the relator

4

may have been prejudiced because the findings, inferences, conclusion, or decision are "affected by an error of law" or are "unsupported by substantial evidence." Minn. Stat. § 268.105, subd. 7(d) (2022). We review the ULJ's factual findings in the light most favorable to the decision and defer to the ULJ's credibility determinations. *Peterson v. Nw. Airlines Inc.*, 753 N.W.2d 771, 774 (Minn. App. 2008), *rev. denied* (Minn. Oct. 1, 2008). We "will not disturb the ULJ's factual findings when the evidence substantially sustains them." *Id.*

A person discharged for employment misconduct is ineligible for unemployment benefits. Minn. Stat. § 268.095, subd. 4(1) (2022). Employment misconduct is defined as "any intentional, negligent, or indifferent conduct . . . that is a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee." *Id.*, subd. 6(a) (2022). An employee's refusal to comply with reasonable policies and requests is misconduct. *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn. 2002). Multiple violations of the same rule amounts to misconduct, *id.* at 806, as does a pattern of failure to comply with policies and procedures, *Gilkeson v. Indus. Parts & Servs., Inc.*, 383 N.W.2d 448, 452 (Minn. App. 1986).

Whether an employee engaged in conduct that disqualifies them from unemployment benefits is a mixed question of fact and law. *Wilson v. Mortg. Res. Ctr., Inc.*, 888 N.W.2d 452, 460 (Minn. 2016). Whether the employee committed an alleged act is a question of fact, which is reviewed in the light most favorable to the decision and will not be disturbed so long as there is evidence to reasonably sustain the findings. *Id.*; *Stagg v. Vintage Place, Inc.*, 796 N.W.2d 312, 315 (Minn. 2011). Whether the employee's actions

5

amount to employment misconduct is a question of law, which appellate courts review de novo. *Stagg*, 796 N.W.2d at 315.

Adenuga argues that the record does not substantially support the ULJ's findings because he did not commit employment misconduct. He asserts that he notified the hospital that he was being bullied and tried to change shifts to get away from the coworkers causing problems.

The ULJ credited the lab supervisor's testimony about the events because it was "detailed and supported by business records" and discredited Adenuga's testimony because he "denied knowing the policy he allegedly violated and indicated he never received any warnings." The ULJ reasoned, "The warnings themselves clearly provided information on the policy the employer believed that he violated, instructed him to review the policy, and Adenuga signed the warnings. This calls into question Adenuga's overall credibility."

We defer to the ULJ's credibility determinations when the ULJ sets forth a valid reason for crediting or discrediting testimony that may significantly impact the ultimate decision. *Peterson*, 753 N.W.2d at 774 (stating that this court "gives deference to the credibility determinations made by the ULJ."). Giving deference to the ULJ's credibility determination, we conclude that substantial evidence in the record supports the ULJ's findings that Adenuga knew about the hospital's policy and that his behavior violated the policy on multiple occasions.

In response to the ULJ's determination that he was terminated for misconduct, Adenuga requested reconsideration based on his assertion that the coworkers' reports were not credible.

We defer to a ULJ's decision whether to grant an additional hearing and will reverse that decision only if the ULJ abused its discretion. *Vasseei v. Schmitty & Sons Sch. Buses Inc.*, 793 N.W.2d 747, 750 (Minn. App. 2010). The ULJ's discretion is not absolute and "must be exercised within the statutory requirements." *Id.* Under the relevant statute, the ULJ

> must order an additional hearing if a party shows that evidence which was not submitted at the hearing:
> (1) would likely change the outcome of the decision and there was good cause for not having previously submitted that evidence; or
> (2) would show that the evidence that was submitted at the hearing was likely false and that the likely false evidence had an effect on the outcome of the decision.

Minn. Stat. § 268.105, subd. 2(c)(1)-(2) (2022).

In the decision following Adenuga's request for reconsideration, the ULJ did not order a new hearing. But after a thorough review of the record, the ULJ evaluated the previous credibility assessment by stating:

> To the extent the facts were disputed, the findings of fact are based upon the employer's testimony that was detailed and supported by business records. Though the employer's testimony relied on secondhand information, it was sufficiently reliable because Coworker 1, Coworker 2, Coworker 3, and Coworker 4 all made reports of similar behavior of Adenuga. It is highly unlikely they would all have a motive to lie about Adenuga. There were also [credibility] issues with Adenuga. Adenuga seemed to downplay his behavior and failed to take accountability for the concerns raised in the warnings. This is exemplified by the information, or lack thereof, he provided, in Exhibit 3. He denied knowing the policy he allegedly violated and indicated he never received any warnings. The warnings themselves clearly provided information on the policy the employer believed that he violated, instructed him to review the policy, and Adenuga signed the warnings. This

7

calls into question Adenuga's overall credibility, so the employer's testimony was likely more credible.

The ULJ then addressed Adenuga's request for reconsideration:

> In his request for reconsideration, Adenuga largely repeats his testimony and arguments from the hearing. The unemployment law judge made a credibility determination regarding the evidence, and the information in the request for reconsideration would not likely change the credibility determination made by the unemployment law judge.

Because the ULJ's findings of fact are based on reasoned credibility determinations and supported by substantial evidence in the record and because we conclude that Adenuga committed acts of misconduct, we affirm the ULJ's determination that Adenuga is ineligible for unemployment benefits.

**Affirmed.**